USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-2167 UNITED STATES OF AMERICA, Appellee, v. ANTONIO MEDINA PUERTA, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Morris M. Goldings with whom Richard S. Jacobs and Mahoney, ___________________ __________________ ________ Hawkes & Goldings were on brief for appellant. _________________ Timothy Q. Feeley, Assistant United States Attorney, with whom __________________ Donald K. Stern, United States Attorney, was on brief for the United _______________ States. ____________________ October 21, 1994 ____________________ BOUDIN, Circuit Judge. On September 5, 1991, a grand _____________ jury indicted Antonio Medina Puerta, charging him with one count of bank fraud under 18 U.S.C. 1344 and one count of transportation in foreign commerce of stolen or fraudulently obtained funds under 18 U.S.C. 2314. The gist of the events described in the indictment was that Medina had deposited a $365 check in his Bank of Boston account, knowingly misrepresented the amount as $365,000, ultimately received a credit of $365,000 to his account, and then transferred $350,000 of these fraudulently obtained funds to his account in an English bank. At arraignment on October 8, 1991, the magistrate-judge ordered that pre-trial motions by the defense be filed by November 1, 1991. On this deadline, Medina filed a number of motions that were subsequently resolved. Medina's trial date was repeatedly delayed, largely at his own request, until January 4, 1993. In the meantime, on November 24, 1992, following a change of counsel by Medina, his new counsel submitted five additional pre-trial motions, accompanied by a motion seeking leave to file the motions late. One of these motions--with which this appeal is in part concerned--asked that the case be dismissed on the ground that it was being pursued in breach of a promise by the prosecutor made in 1987 not to prosecute if Medina made restitution to the bank of $200,000. The government opposed -2- -2- the motion to file out of time. On December 30, 1992, the district court denied the request to file motions out of time (with exceptions not here relevant), ruling that good cause had not been shown for the late filing. The court also said that it had "nevertheless" examined the substantive motions to see whether an exception should be made in the interests of justice; in giving a negative answer, the court found the assertions made in support of the motion to dismiss were insufficient to justify an evidentiary hearing. Medina was tried in January 1993. The evidence, taken in the light most favorable to the government, see United ___ ______ States v. Ford, 22 F.3d 374, 382 (1st Cir.), cert. denied, 63 ______ ____ ____________ U.S.L.W. 3265 (U.S. Oct. 3, 1994), showed the following. In 1986 Medina was a research associate at a non-profit research organization in Boston then known as the Eye Research Institute. Medina had been born and raised in Spain and was fluent in both English and Spanish. He had Spanish graduate degrees in optics and engineering and a graduate degree in electrical engineering from Massachusetts Institute of Technology. On November 3, 1986, Medina deposited a check in his account in that branch of the Bank of Boston where he did most of his banking. The check was a bank check prepared by Banco Central of Spain, dated October 30, 1986, at Toledo, Spain, and was made payable to Medina. The written -3- -3- designation of the amount was, in Spanish, "Dolares USA, Trescientos Sesenta Y Cinco," which translates as "three hundred and sixty-five U.S. dollars." There was also an arabic-numeral expression of the amount in a small box on the right-hand side of the check: "USD 365,ooo." The words "First National Bank of Boston" appear on the check, and both the government and Medina have described it as a check drawn on Banco Central's own checking account at the Bank of Boston. When Medina deposited the check in his account on November 3, 1986, he listed the amount on the deposit slip as "$365,000." Two days later, on November 5, Medina returned to the branch and requested a customer service representative, Lisa Popielski, to wire $350,000 from Medina's checking account to an account in England. Apart from the November 3 deposit, Medina's balance was about $3,000. Popielski said that she needed to verify that the check had been collected and asked Medina to return the next day. When Medina returned on November 6, Popielski told him that the $365,000 credit had been deleted from his account and the check had been returned to him by mail. She told him to bring the check back to her if he intended to redeposit it. The following day, November 7, Medina returned with the check and Popielski told Medina that the check had been -4- -4- returned for lack of his endorsement; he then signed the back of the check, Popielski filled out a second deposit slip for him in the amount of $365,000, and Medina redeposited the check into his account. On November 12, Medina returned to the bank and signed a wire transfer order, directing the transfer of $350,000 to an account in his name at Lloyd's Bank in Cambridge, England. Later that morning the funds were wired to England. When interviewed by the FBI in early December 1986, Medina admitted that he had deposited the check but explained that he thought that the check was funding from a Spanish ministry for a research grant for his work at the Eye Research Institute. He said that he had purchased about $150,000 worth of equipment in Spain where it remained and where some of the research was to be conducted. Medina subsequently gave to the FBI a letter from a Spanish ministry stating that a committee had agreed to propose the funding of a grant. Medina also submitted to the FBI a summary document prepared within the National Institutes of Health which recommended NIH approval of a research application by Medina with proposed funding of $282,286. There was evidence at trial that this application had never been finally approved and that, if it had been funded, the Eye Research Institute and not Medina would have received the funds. There was also -5- -5- some evidence, apparently disputed, that Medina had in fact purchased $138,755 in specialized equipment in Spain. At trial it developed that the bank had stumbled repeatedly. The processing section of the bank had queried Banco Central about the check, and on November 6, the day before Medina had redeposited the check, Banco Central had ______ wired that the proper amount of the check was $365. When Medina redeposited the check on November 7, only $365 was debited against Banco Central's account, but Medina was credited with a $365,000 deposit. An interoffice adjustment slip was prepared to reduce Medina's deposit by $364,635, but Medina's account records were not corrected until on or about November 25 when most of the money had long since been transferred to England. Although Medina did not testify, his position at trial was that this was an innocent misunderstanding. Medina did present an expert witness who was familiar with Spain and Spanish accounting who gave testimony on the differences between American and Spanish practices in the writing and punctuation of arabic numbers on large checks. The government's position was that Medina had certainly read the written Spanish words on the check, which indisputedly represented its amount as $365, and had known that he was not entitled to $365,000. -6- -6- On January 28, 1993, the jury convicted Medina on both counts. Thereafter, Medina filed post-trial motions renewing his request for an evidentiary hearing on the government's supposed breach of a promise not to prosecute. In a supplemental memorandum, Medina said that new evidence showed that the government had a motive to retaliate which explained its breach of the alleged promise not to prosecute. The court denied the motions, calling the proffer inadequate. On September 30, 1993, the court sentenced Medina to 18 months' imprisonment and required that Medina pay fines or restitution in a total amount of $150,000. The court stayed the sentence pending this appeal. Medina's initial arguments on appeal relate to his pre- and post-trial requests for a hearing on his claim that the government breached its promise not to prosecute if restitution were made. The government says that the original pre-trial motion was submitted late, together with the request for leave to file; leave was not granted because no adequate excuse for the delay was given; and that should be the end of the matter. Medina, scarcely acknowledging the refusal to grant his motion to file late, attacks the district court's ruling that the proffer was insufficient to justify an evidentiary hearing. We see no reason to choose between the alternative grounds for denial of a hearing--lateness and lack of merit-- -7- -7- because each is adequate. The original motion was filed long after the deadline with no explanation other than a change of counsel. Where the district court refuses to allow a new motion to be filed out of time, the standard on appeal is abuse of discretion. E.g., United States v. Roberts, 978 ____ ______________ _______ F.2d 17, 21 n.5 (1st Cir. 1992). If the district judge had rested solely on the lateness of the pre-trial motion and refused to entertain a post-trial replicate of the same motion, there would be no abuse of discretion. Nor would the district court's precautionary comment on the merits in denying leave to file either remove the lateness objection or alter our standard of review. The result is no different if we do consider the merits. In substance, Medina's proffer asserted that in July 1987 an assistant U.S. attorney advised Medina's then counsel that the government would not prosecute Medina if he would agree to make restitution to the bank in the amount of $200,000. The proffer then concluded: "By the end of 1988, I [Medina] had paid the Bank of Boston an amount greater than $200,000." Medina's affidavit was also the basis for the post-trial motion making the same request for a hearing on the same ground. This affidavit does not say that Medina ever formally accepted the government's offer or that his payments to the bank were in compliance with the purported agreement. Our -8- -8- sense that the affidavit is the product of artful drafting is reinforced by indications that the Bank of Boston recovered substantial amounts by attaching Medina's account at another bank. Medina also made no effort, as far as we can ascertain, to remedy the deficiencies in his affidavit after they were first noted by the district court. Evidentiary hearings are not required when there is no likely prospect that they will be fruitful. United States v. McAndrews, 12 _____________ _________ F.3d 273, 280 (1st Cir. 1993). The supplementary post-trial claim that the prosecution was based on a vindictive motive is scarcely worth comment. Medina's further affidavit on this issue is both sketchy and jumbled, but rests importantly on a lawsuit brought by Medina against the government. The government pointed out in a motion to strike Medina's submission that the lawsuit in question was brought after Medina had been indicted. Its _____ untimeliness aside, Medina's new affidavit added little to the prior one and provided no independent basis for an evidentiary hearing. Several of Medina's merits arguments are significant. We start with those that relate only to bank fraud which was the offense charged in count I of the indictment. As it stood at the time Medina deposited his check (it has since been twice amended), the statute in pertinent part read as follows: -9- -9- (a) Whoever knowingly executes, or attempts to execute, a scheme or artifice -- (1) to defraud a federally chartered or insured financial institution or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises . . . . [shall be punished as set forth in the statute]. 18 U.S.C. 1344(a). Count I of the indictment charged that Medina had executed or attempted to execute a scheme both to defraud a federally chartered or insured bank and to obtain its ___ property by false or fraudulent representations. Consistent with the statutory language, the district judge told the jury that it could convict on count I if it found either a scheme to defraud or a scheme to obtain property by means of false __ or fraudulent representations. Medina's first objection is that under subsection (a)(2), two or more misrepresentations are required1 and that here, according to Medina, the government charged only one misrepresentation and proved none at all. The government responds that the evidence was adequate to show a scheme to ____________________ 1This issue was left open in United States v. Lilly, 983 _____________ _____ F.2d 300, 305 n.10 (1st Cir. 1992), and we have no occasion to decide it here. -10- -10- defraud under subsection (a)(1) so that it does not matter whether misrepresentations need to be multiple or were adequately proved under subsection (a)(2). But here, the false or fraudulent representations charge was also submitted to the jury as an alternative basis for convicting under count I. Thus, at least in theory, a problem might be presented for the government if it had charged only one false representation or failed to prove any. In fact, we think that the government's indictment alleged multiple representations and the evidence permitted the jury to find at least two. The indictment charged Medina with making false and fraudulent "representaions" [sic], and the district court charged the jury that "representations" were required. Although the indictment also said that Medina's conduct involved submitting "a check he represented to be in the amount of $365,000.00, knowing the check to be in the true amount of $365.00," we do not see why this generic statement prevented the government from proving that this representation was made more than once. As for the adequacy of the evidence, two misrepresentations could easily have been found. Medina's first deposit slip said that the check was in the amount of $365,000 when the words on the check said plainly, although in Spanish, that the amount was $365. When the check was redeposited on November 7, Medina again submitted a deposit -11- -11- slip in the larger amount. Medina does not claim that the check was actually for $365,000. Instead he says that Popielski completed the second deposit slip and that there is no evidence to show that he (Medina) filled out the first one. Ample evidence showed that it was Medina who submitted the check on November 3 with a deposit slip in the amount of $365,000; the evidence included surveillance photographs showing him at the teller's window making a deposit transaction at the time stamped on the bank of his deposit slip. As for the redeposit on November 7, again confirmed by a surveillance photograph of Medina at the teller's window, it is irrelevant that Popielski wrote the amount on the second deposit slip so long as Medina knowingly presented it. Thus, there was proof of at least two false representations by Medina, one on each presentation of the check. Medina's second argument on count I is that the district court erred in refusing to instruct the jury that "the deposit of a check alone [is not] a misrepresentation" and that "[a] check is not a factual assertion at all and therefore cannot be characterized as true or false." These requested statements were drawn from Williams v. United ________ ______ States, 458 U.S. 279 (1982), where the Court said that a ______ check was merely an order to pay funds and did not constitute an implied representation that the one who made and deposited -12- -12- it actually had funds in the account on which the check was drawn.2 The district court refused to charge the jury in this case with the language drawn from Williams. We believe ________ that its decision was correct. The government in our own case was not relying on any implied representation that Medina had funds on deposit sufficient to cover the check. Rather, the government charged that in depositing the check Medina had affirmatively misrepresented--at least through the deposit slips--that the check being deposited was one whose face value was $365,000. We have read both the indictment and the government's closing arguments to the jury, and conclude that there is no chance that the jury misunderstood the government's theory. That theory does not present the implied misrepresentation problem addressed in Williams. ________ Next, in a very brief argument, Medina claims without explanation that "the only possible victim" of any scheme to defraud in the present case would have been Banco Central, admittedly not a federally chartered or insured institution. The evidence showed the Bank of Boston, which is covered by the statute, was induced by Medina's misrepresentations to pay out a large sum to Medina. It is not clear whether Bank ____________________ 2Williams was a prosecution under a false statements ________ statute of a defendant who deposited in his account in one bank a check--not covered by adequate funds--that he drew on his account in a second bank. -13- -13- of Boston might have had a claim against Banco Central or its account for the latter's mistake in depicting arabic numerals; Banco Central, after all, had warned Bank of Boston about the mistake before the redeposit. But that possibility does not alter the fact that Bank of Boston was the immediate victim of the fraud. Finally, Medina makes the interesting argument that the jury might have convicted Medina without true unanimity, some (but not all) jurors believing that he had violated section 1344(a)(1), and others (but not all) believing that he violated section 1344(a)(2). Both the government and Medina agree that the two subsections identify separate crimes. Accord United States v. Bonnett, 877 F.2d 1450, 1455 (10th ______ _____________ _______ Cir. 1989). If so, it follows that Medina could not be convicted of a crime unless the jurors could all agree that at least one of the subsections had been violated. This same problem is sometimes presented where a single crime is defined by several alternative acts any one of which suffices ___________ for conviction.3 The government accepts that unanimity was required but cites us to a "general rule" that "when a jury returns a guilty verdict on an indictment charging [in one count] ____________________ 3Compare United States v. Gipson, 553 F.2d 453 (5th Cir. _______ _____________ ______ 1977), involving a statute directed at anyone who "receives, conceals, stores, barters, sells or disposes of" certain stolen property. See generally 3 W. LaFave & J. Israel, _____________ Criminal Procedure 23.7 (1984). __________________ -14- -14- several acts in the conjunctive, the verdict stands if the evidence is sufficient with respect to any one of the acts charged." United States v. Murray, 621 F.2d 1163, 1171 n.10 _____________ ______ (1st Cir.), cert. denied, 449 U.S. 837 (1980). See also _____________ ________ Turner v. United States, 396 U.S. 398, 420 (1970). But it is ______ _____________ one thing to say that the evidence is sufficient if adequate ________ to establish any one of several acts charged in the alternative; it is quite another to take the general language of Murray and Turner to foreclose any inquiry into the ______ ______ adequacy of the instructions. ____________ Here, the government concedes that two separate crimes were created by the two subsections. Thus, we see no reason why Medina would not have been entitled on request to an instruction that the jury had to agree unanimously that either section (a)(1) or subsection (a)(2) was violated (or __ both). Of course, where two separate crimes are charged but each in a separate count, the problem evaporates because the jury is told that it must be unanimous on each count of conviction. Here, the government charged a violation of both ____ subsections in a single count, and Medina, probably not wishing to be charged with three counts rather than two, apparently did not argue that count I was duplicitous. Thus, the risk of jury confusion cannot be answered here by pointing to the normal requirement that the jury be unanimous on any count of conviction. -15- -15- The government argues that the district court in this case charged the jury that it could find either a scheme to defraud "or" a scheme to obtain monies by means of false representations; that the government had "to prove each part of each offense beyond a reasonable doubt"; and that the jury verdict must be unanimous. But these instructions do not _______ clearly tell the jury that it had to be unanimous in finding within count I of the indictment either a scheme to defraud ______ or a scheme based on false representations. That is perhaps what the jury would have understood, but it is not inevitable. Still, the defense did not ask for any clarification or instruction on this issue, so reversal can be had only for plain error. E.g., United States v. Arias-Santana, 964 F.2d ____ ______________ _____________ 1262, 1268 (1st Cir. 1992). We see no practical likelihood that the jury could have divided along the lines now suggested by Medina. Although in theory we may be talking about two separate crimes, in this case the evidence offered as to count I made the same conduct the basis for both the ____ fraud and misrepresentation branches of count I. Indeed, that is probably why the government charged both subsections in a single count. In all events, on this evidence, the jury ____ either had to believe that Medina violated both subsections or neither. There was no realistic possibility of a split verdict of the kind now conjectured by Medina. -16- -16- If the trial judge had been asked to clarify the point, quite likely he would have told the jury that it had to find unanimously either a scheme to defraud or a scheme based on false representations. Probably he was not asked to do so because no actual threat existed here of a non-unanimous verdict. There was not only no plain error but arguably no error at all. On other facts--for example, where divergent conduct underlay the two branches of subsection (a) or the same conduct could realistically violate one branch but not the other--our view might be quite different. Medina's next claim of error relates to count II of the indictment in which he was charged with having "transmitted and transferred in foreign commerce money in the amount of $350,000.00, more or less, knowing the same to have been stolen, converted and taken by fraud . . . ." The statute in pertinent part makes it unlawful to "transport in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. 2314. Medina argues on appeal that under this statute the property must have been stolen "before being transported." See United States v. Tashjian, 660 F.2d 829, 840 (1st Cir.), ___ _____________ ________ cert. denied, 454 U.S. 1102 (1981). Here, Medina's brief ____________ says blandly but without explanation, "no money had been -17- -17- stolen or taken by fraud at the time of the transfer." Possibly what Medina intends to argue is that the bank's money was not stolen, converted or taken by fraud merely on account of the wrongful credit to Medina's account on November 7 because at that time no money had yet been paid out by the bank. Put differently, Medina may be claiming that when transferred the money had not yet been stolen. ___ We see no reason why the fraudulent taking required any more than Medina's deposit of the check in Medina's account, the misrepresentations, the availability of the money to him, and the requisite scienter. Popielski testified that the $365,000 was available to Medina for withdrawal on November 10, at least two days before the wire transfer to England. True, the bank could have nullified the deposit before the transfer, had it been more alert; but from November 10 onward the money was just as much available to Medina as if it were cash stored under his mattress. Medina's final set of arguments is directed to both of the counts against him. He starts with a straightforward argument that the Bank of Boston could not have been defrauded of its money, nor could the money have been taken by fraud, since Banco Central informed Bank of Boston prior to the second deposit on November 7 that the amount of the check was $365. The government concedes that a defendant, whatever his state of mind, cannot be convicted of possessing -18- -18- drugs or stolen property if the substance is not in fact a controlled substance or the property not stolen. E.g. United ____ ______ States v. Rose, 590 F.2d 232, 235 (7th Cir. 1978), cert. ______ ____ _____ denied, 442 U.S. 929 (1979); United States v. Oviedo, 525 ______ ______________ ______ F.2d 881, 885-86 (5th Cir. 1976). In such cases, of course, a change in the nature of the property can defeat an essential element of the offense. The government may overstate the matter in arguing that "[i]n contrast the crime of bank fraud focuses on Medina and his state of mind, and not on the conduct of the bank." It might be difficult to defraud an individual, or obtain property by fraud, if the "victim" were well aware that the defendant's statements were untrue. But the analogy is unrealistic as applied to a large bank which happens to have the true facts somewhere in its files. There is no indication that Banco Central's warning was known to the bank teller who accepted the check for credit on November 7 or to Popielski when she facilitated the deposit and authorized the wire transfer. It may well be that for other purposes, say under the Uniform Commercial Code, notice to the bank through proper channels is, in some sense and for some purposes, notice to everyone within the bank. But Medina did defraud the bank representatives with whom he dealt; and money was credited to his account and transferred out of the bank because of their -19- -19- belief in his statements, and not on some independent basis. It is hard to imagine any reason of practical policy to accept the unitary-victim argument that Medina may be urging. Absent compelling authority, we reject the argument. Medina next says that the same deposit and transfer has been charged as two separate offenses in two counts, making the indictment multiplicitous. This argument rests on the fact that in part of count I the government mentioned the transfer of $350,000 out of Medina's account. The same transfer, including a reference to the original taking by fraud, is the heart of count II of the indictment. Although multiplicity is forbidden by double jeopardy principles, the use of the same evidence or conduct in relation to two different counts does not itself establish multiplicity. Even "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires [as an element] proof of a fact which the other does not." United States v. _____________ Blockburger, 284 U.S. 299, 304 (1932). Here, section 1344 ___________ required proof that a scheme had been executed against a federally insured bank; section 2314 required proof of interstate or foreign transportation of stolen property. Each provision thus requires proof that the other does not. -20- -20- Medina's last argument is that the evidence simply did not permit a rational jury to find him guilty on either count and, alternatively, that the district court should at least have ordered a new trial. The denial of a motion to direct an acquittal is reviewed de novo, United States v. Gonzalez- __ ____ _____________ _________ Torres, 980 F.2d 788, 790 (1st Cir. 1992), and the trial ______ court's denial of a new trial request is reviewed for abuse of discretion. United States v. Nickens, 955 F.2d 112, 116 ______________ _______ (1st Cir.), cert. denied, 113 S. Ct. 108 (1992). We need not ____________ differentiate sharply, because in this case the jury's verdict was neither irrational nor against the weight of the evidence. Medina's conduct was largely undisputed, and the critical issues involved his knowledge and state of mind. Absent a confession of guilt, the government's case could not be air-tight. Yet there was no proof that Medina had ever applied to a Spanish ministry for a grant of $365,000 or expected such a check from Banco Central. His persistence and haste in getting the money deposited into his account and then out of the country were at least suspicious. The jury must certainly have thought that Medina's story of an innocent mistake was fragmented, improbable in a number of respects, and ultimately did not hang together. It is beside the point that the bank's customer service representative misread the check; there is no indication that -21- -21- she could read Spanish, as Medina could. She also had no way of knowing whether Medina might or might not be expecting a check in this amount. Medina's brief states that his own expert witness thought that the value of the check was $365,000. In fact, the expert, whose testimony would not in any event be binding on the jury, testified to the value of the check, "as reflected in that box," i.e., the box that ____ contained the mistaken arabic numerals "$365,ooo." Finally, in an attempt to bolster his lack of evidence claim, Medina's brief singles out a variety of comments and arguments made by the prosecutor that Medina says misled the jury. It appears that none of the statements was the subject of objection at trial; while one or two might have been subject to adjustment, none is especially troubling or even remotely close to plain error. The prosecutor's remarks provide no reason to hesitate in our appraisal of the evidence. Affirmed. ________ -22- -22-