UNITED STATES, Appellee,

v.

Kerr CARRINGTON, Defendant—
Appellant.

No. 95–2211.

United States Court of Appeals,
First Circuit.

Heard June 5, 1996.

Decided Sept. 18, 1996.

LisaAyn Padilla by appointment of the Court, Cambridge, MA, for defendant–appellant.

Donald L. Cabell, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, and Dina Michael Chaitowitz, Assistant United States Attorney, Boston, MA, were on brief, for appellee.

Before TORRUELLA, Chief Judge, CYR and LYNCH, Circuit Judges.

TORRUELLA, Chief Judge.

On March 28, 1995, Defendant Kerr Carrington ("Carrington") pleaded guilty to four counts of interstate transportation of property taken by fraud (Counts I through IV), *see* 18 U.S.C. § 2314, and two counts of wire fraud (counts V and VI), *see* 18 U.S.C. § 1343. On August 21, 1995, Carrington was sentenced to a term of 50 months incarceration, followed by a 36 month period of supervised release, and a mandatory special assessment of $50. He contests the validity of his plea based on Federal Rule of Criminal Procedure 11(f) and also appeals his sentence on several grounds. We affirm both his conviction and his sentence.

## I. *BACKGROUND*

The case arises from two separate sets of schemes to defraud. In the first set, charged in Counts I through IV and spanning from December 1993 to April 1994, Carrington negotiated the purchase of four expensive cars from out-of-state dealers. He then tricked the dealers into believing that they had received wire transfers in payment for the cars. All four cars were then shipped to Carrington in Massachusetts. Carrington was arrested on May 3, 1994, and released on conditions pending further proceedings in the district court. On or about July 8, 1994, Carrington and the government entered into a plea agreement pursuant to which he agreed to plead guilty to all four counts of the information, which was filed on July 19, 1994. Carrington did not immediately waive indictment and plead to the information. Instead, upon Carrington's motion, the Probation Office began working on the Presentence Report ("PSR") with the intention of

**4**

having Carrington plead and be sentenced upon its completion.

In the second set, charged in Counts V and VI, which he executed while on release in connection with Counts I through IV, Carrington sought to obtain and deposit bank drafts drawn against the corporate bank accounts of various companies. The conduct charged as Count V took place in November 1994. On or about November 14, 1994, while the parties were awaiting the preparation of the PSR, Carrington, identifying himself as Chad Littles ("Littles"), the Accounts Receivable/Payroll Manager of Quorum International, Ltd. ("Quorum"), opened an account with International Banking Technology, Inc. ("IBT"), of Springfield, Virginia. IBT provides a bank drafting system that allows creditors to collect payment over the phone by having the debtor pre-authorize a one-time debit to his or her account. When IBT is provided with the debtor information by its client, it prepares bank drafts (or permits the client to produce the bank drafts by means of its software) that are deposited by IBT's client into its bank account. When these drafts are processed, the debtor's account is debited and the creditor receives payment. On or about November 16, 1994, Carrington faxed thirty completed Bank Draft Sales Forms ("draft forms") to IBT. These draft forms are used to provide IBT with the information necessary for it to produce the bank drafts for the one-time pre-authorized debits. The draft forms that Carrington faxed to IBT provided all of the necessary information including the name of the company to charge, its checking account number, and the amount of the draft requested to cover the purported pre-authorized one-time debit. Carrington requested that IBT prepare 30 bank drafts of $5,000 each for a total of $150,000, which purportedly was to constitute payment for attendance at a seminar allegedly held by Quorum. Carrington's attempt failed, however, when as part of IBT's fraud control system, it attempted to verify the authorization for some of the bank drafts, and it found that some of the phone numbers

were incorrect. Because IBT suspected fraud, it never completed processing Carrington's request, and Carrington failed to obtain the funds he sought.

The conduct charged in Count VI took place in December 1994. On or about December 5, 1994, Carrington, identifying himself as Paul Epstein ("Epstein"), Chief Financial Officer of Citibank, phoned IBT, faxed them an application for bank draft forms, and requested IBT software that would permit him to transmit his requests for bank drafts to IBT by modem. This software also allowed Carrington to receive from IBT, by modem, the instructions necessary to print the bank drafts at his home. On December 29, 1994, Carrington sent to IBT by modem 80 forms for printing bank drafts at his residence, which were to be used to debit 80 different companies' accounts in varied amounts totalling $583,-443.50. He failed to obtain the total amount sought, receiving and depositing $268,000 into a personal account before the U.S. Secret Service discovered his actions.

Based on the events of November and December 1994, the government filed a superseding information adding two counts of wire fraud, Counts V and VI, to the previous Counts I through IV. Pursuant to a second plea agreement, Carrington waived indictment and pled guilty to all six counts of the superseding information on March 28, 1995. He was sentenced on August 21, 1995.

## II. DISCUSSION

### A. Carrington's Rule 11 argument

■ In his brief, without having so argued below, Carrington contends that the district court erred under Federal Rule of Criminal Procedure 11(f) by calculating his sentence in part on a plea for which there was no factual basis.[1] Specifically, he argues that even viewed in the light most favorable to the government, there was no proof that the vehicles involved in the information Counts I through IV were stolen prior to their place-

1. Fed.R.Crim.P. 11(f) ("Determining accuracy of plea") provides that:
   Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment

upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

ment into the stream of interstate commerce, which he alleges is an essential element under the Act.

■ Because Carrington seeks to withdraw his plea following the imposition of his sentence, he must show that the plea proceedings were marred by "a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure."[2] *United States v. Ferguson*, 60 F.3d 1, 2 (1st Cir.1995) (internal quotations omitted); *see* Fed.R.Crim.P. 32(e); *see also* former Fed.R.Crim.P. 32(d), comment. (advisory committee's note to 1983 amendments to predecessor of Rule 32(e)); *United States v. Japa*, 994 F.2d 899, 902 (1st Cir.1993) (stating that, to set aside a plea post-sentencing, the reviewing court must find "a fundamental defect or a miscarriage of justice").

Carrington's appeal does not meet this high standard. Carrington's sole argument under Rule 11(f) is that there was no evidence that the vehicles involved in Counts I through IV were stolen before they were placed into the stream of commerce. We reject Carrington's challenge for two reasons, either of which would suffice independently to justify our conclusion. First, we have previously rejected a similar argument under 18 U.S.C. § 2314, Carrington's statute of conviction. *See United States v. Puerta*, 38 F.3d 34, 41 (1st Cir.1994). Much as Carrington does here, the defendant in *Puerta* argued that " 'no [property] had been stolen or taken by fraud at the time of transfer.' " *Id.* (quoting brief of defendant). Paraphrasing that argument as a claim "that when transferred the [property] had not *yet* been stolen," *id.* (emphasis in original), we concluded that we could "see no reason why the fraudulent taking required any more than" acceptance of the property, misrepresentations, access to the property, and "the requisite scienter." *Id.* Similarly, given that Carrington does not argue that there was no

factual basis to find that he accepted the vehicles, made misrepresentations, had access to the vehicles, and had the requisite intent—"knowing the [vehicles] to have been stolen, converted *or* taken by fraud," 18 U.S.C. § 2314 (emphasis added)—his argument that there was no factual basis to find the vehicles stolen before transport must fail, because it is simply irrelevant.

Second, Carrington pled guilty to four counts of transporting or causing to be transported vehicles which he knew to be "stolen, converted *and* taken by fraud." However, the statute itself is phrased in the disjunctive, punishing the transport of goods known to be "stolen, converted *or* taken by fraud," *see* 18 U.S.C. § 2314, as Carrington himself quotes in his brief. Carrington argues that there is no factual basis for the conclusion that the goods were stolen when transported, but makes no reference to conversion or fraudulent takings. But even if he were correct with respect to the "stolen" prong of the statute, he would still need to persuade us with respect to both of the other two prongs. However, Carrington does not contend that a factual basis is absent to support the proposition that he caused the goods to be transported and that he took them by fraud—an alternative basis for criminal liability under section 2314, and a basis included in the information to which he pled guilty. Even if Carrington were to so argue, it would not profit him, since the presentence report established a more than adequate basis for the plea under the "taken by fraud" theory. *See United States v. Ferguson*, 60 F.3d 1, 4 (1st Cir.1995) (recognizing PSR as adequate factual basis for plea when considering propriety of plea withdrawal). As a result, we conclude that no defect or miscarriage of justice exists to require that we reverse the district court's sentencing decision or vacate Carrington's plea due to an inadequate factual basis for the plea pursuant to Fed. R.Crim.P. 11(f).

**2.** We recognize that the burden a defendant bears on a post-sentencing appeal from a guilty plea in this Circuit is "somewhat cloudy," *United States v. Martínez–Martínez*, 69 F.3d 1215, 1219 (1st Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1343, 134 L.Ed.2d 492 (1996), as previous cases have held direct appellants only to a harm-

less error standard. *Id.; see, e.g., United States v. Parra–Ibañez*, 936 F.2d 588, 598 & n. 24 (1st Cir.1991). We note, however, that although we follow the more stringent standard set out in *Ferguson* and *Japa*, even were we to apply harmless error review, Carrington's argument would fail.

Besides the argument with respect to his plea, Carrington also raised an ineffective assistance of counsel challenge for the first time at oral argument. Ordinarily, we do not address ineffective assistance of counsel arguments on direct appeal. *See United States v. Mala,* 7 F.3d 1058, 1063 (1st Cir. 1993) (holding that absent extraordinary circumstances, fact-specific claims asserting ineffective assistance of counsel are not cognizable on direct appeal), *cert. denied,* —— U.S. ——, 114 S.Ct. 1839, 128 L.Ed.2d 466 (1994). This case is no exception. Carrington argues that his trial counsel improperly led him to plead guilty. However, these charges depend on evidentiary matters which are best considered by the district court in the first instance. *Id.* at 1063. Accordingly, Carrington's claim of inadequate assistance is not properly before us, and so we do not consider it.

### B. The value and loss determinations in Counts I through IV

Carrington disputes the values assigned by the PSR—that is, the values represented by the prices he promised to pay the dealers he contacted—and adopted by the district court in sentencing, to the four cars that were the subjects of Counts I through IV, respectively. He contends that the district court should instead have valued the car in Count I at $30,000—the amount of money he obtained in the sale of the car—and for Counts II through IV the court should have used the fair wholesale value of the vehicles. Carrington points out that the only reference to valuation in the record, apart from references to "an agreed upon price," is in the FBI agent's affidavit of the car dealer's statements. He adds that the only information on personal knowledge as to the value of any car was the $30,000 willingly paid by a car dealer for the car in Count I. Carrington notes that while the Guidelines use "fair market value" as the measure of the value of stolen property, that rule is not absolute, and in fact, if market value is difficult to ascertain or inadequate to measure the harm to the victim, alternative methods of valuation may be used. U.S.S.G. § 2B1.1, n. 2.

This court reviews *de novo* the district court's interpretation of the loss provisions of the Guidelines. Thereafter, it normally reviews a district court's factual findings only for clear error. *See, e.g., Koon v. United States,* —— U.S. ——, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Skrodzki,* 9 F.3d 198, 202 (1st Cir. 1993). But where, as here, a defendant fails to object to the court's loss computation—as Carrington concedes in his brief— review is for plain error.

Carrington's essential contention, without record support, is that the prices he negotiated in relation to the vehicles involved in Counts II through IV were overstated in order to induce the dealers' agreement. But in fact, the PSR suggests that Carrington negotiated the price of each vehicle in an arm's length transaction. Under section 2B1.1, comment. (n.2), a product's fair market value is ordinarily the appropriate value of the victim's loss. Here, it was reasonable, particularly in light of the bargaining between Carrington and the dealers, for the district court to calculate the market value of each vehicle to be the price Carrington negotiated with each dealership. *See, e.g., United States v. Warshawsky,* 20 F.3d 204, 213 (6th Cir.1994) (applying market value in a section 2314 case to mean the price a willing buyer would pay a willing seller at the time and place the property was taken). Loss need not be determined with precision, and in fact may be inferred from any reasonably reliable information. *See, e.g., Skrodzki,* 9 F.3d at 203. Furthermore, it was reasonable for the court to adopt the retail rather than the wholesale values of the cars, since all of the dealerships from whom Carrington obtained the cars were engaged in retail sales of automobiles. As a result, we conclude that the district court did not commit plain error in determining the market value of the vehicles in Counts I through IV.

### C. Carrington's argument that Counts V and VI should have been sentenced as attempts

Carrington contends that the sentencing court erred in concluding that Counts V and VI were both completed

crimes, with a total intended loss of $583,000. He argues that the lack of actual loss counsels for the proposition that Counts V and VI should be classed as mere attempts, pursuant to the Guidelines. *See* U.S.S.G. § 2X1.1(b)(1) (mandating a decrease by 3 levels for an attempt). Thus, he posits, the offense levels for those counts should be lower than those the district court attributed to them. We review the district court's legal ruling concerning the scope of section 2X1.1 *de novo*, but uphold the application of section 2X1.1 to the facts of Carrington's offense conduct so long as it is not clearly erroneous. *United States v. Chapdelaine*, 989 F.2d 28, 34 (1st Cir.1993) (discussing clear error with respect to section 2X1.1), *cert. denied*, 510 U.S. 1046, 114 S.Ct. 696, 126 L.Ed.2d 663 (1994).

In making this argument, Carrington confronts our opinion in *United States v. Egemonye*, 62 F.3d 425 (1st Cir.1995). In that case, the district court calculated loss pursuant to section 2F1.1 based on the total aggregate limits of the credit cards that the defendant wrongfully obtained. *Id.* at 429. The defendant argued that because section 2F1.1 references section 2X1.1 regarding "partially completed offense[s]," and because he had actually inflicted a loss of only about 53 percent of the aggregate credit limit before his scheme was interrupted by arrest, the district court erred in denying him the lower offense level attendant to an only "partially completed" crime. *Id.*

We rejected the application of section 2X1.1 to the defendant's conduct in *Egemonye*. *Id.* at 430. We noted that there were two competing views of section 2X1.1. It could be viewed as offering a reduction for potential versus completed harm; alternatively, its provisions could be read literally to direct its application only where the defendant has not completed the actions necessary to the substantive offense. *Id.* In siding with the latter view, we stated that

> [t]here would be nothing irrational in deciding that actual harm is worse than intended harm and providing a three-level discount wherever the sentence for a completed offense is measured in part by intended harm. But this is not in general

the philosophy of the guidelines; if it were, possession of drugs with intent to distribute would be punished less harshly than the actual sale of an equivalent amount....

[T]he cross-references in section 2F1.1 are easily explained; they do invoke the discount, or the possibility of a discount, where the underlying crime is merely an attempt or conspiracy.... Here, by contrast, all 51 of the cards were the subject of completed crimes.

*Id.; see, e.g., United States v. Sung*, 51 F.3d 92, 95 (7th Cir.1995) (applying the same view of section 2X1.1 to sentencing of a defendant who was arrested in the midst of a scheme to traffick counterfeit hair care products).

To be sure, Carrington tries to distinguish *Egemonye* from his case. In his brief, Carrington contends that the defendant in *Egemonye* had the credit cards and the present ability to turn the cards into cash, while, with respect to Count V, Carrington would still have had to actively negotiate the drafts even had he received them from IBT. He asserts that he never came close to being in a position to negotiate the drafts. However, Carrington does not dispute that IBT's own fraud control unit prevented him from receiving those drafts. Furthermore, Carrington also does not dispute that he did in fact transmit a wire communication pursuant to a scheme to defraud. As a result, Carrington had completed the necessary elements of the charged offense, wire fraud, just as the defendant in *Egemonye* had. Thus, we conclude that *Egemonye* is squarely on point.

█ In light of *Egemonye*, section 2X1.1 is simply not applicable as Carrington contends. Carrington was convicted under Counts V and VI of wire fraud, not attempted wire fraud or wire fraud conspiracy. The crime of wire fraud does not require that the defendant's object be attained. It only requires that the defendant devise a scheme to defraud and then transmit a wire communication for the purposes of executing the scheme. *See* 18 U.S.C. § 1343. Here, Carrington completed the necessary acts for the crime of wire fraud in Count V when he faxed thirty bank draft sales form requests to IBT in furtherance of his scheme to obtain

$150,000, and in Count VI when he sent by modem eighty transaction requests to IBT in furtherance of his scheme to obtain $583,-443.50. Because section 2X1.1 does not apply to completed substantive offenses, *Egemonye*, 62 F.3d at 430, we conclude that the district court correctly denied a reduction in offense level pursuant to section 2X1.1. As a result, we find no error of law or application that justifies such a reduction.

### D. Carrington's argument that the district court double counted loss in sentencing him pursuant to Counts V and VI

▇ Carrington maintains that the district court erred in its loss calculation in sentencing him for the offenses charged in Counts V and VI. Specifically, he contends that part of the loss that the district court attributed to Count VI was an effective double counting of loss in Count V, since the offense in Count VI was an effort, in part, to make up for the lack of success of the conduct in Count V. Citing to Guidelines sections 2F1.1 and 2B1.1, Carrington maintains that the district court should not have found that Counts V and VI were two individual offenses. *See* U.S.S.G. § 2F1.1 ("Fraud and Deceit; Forgery ... "), comment. (n.7) (directing that "[v]aluation of loss is discussed in the Commentary to § 2B1.1") and 2B1.1 ("Theft, Embezzlement ... "), comment. (n.2) (stating that "[i]n certain cases, an offense may involve a series of transactions without a corresponding increase in loss"). Instead, argues Carrington, these Counts were in fact merely parts of a larger scheme, deserving of an accordant reduction in offense level.

▇ Had Carrington raised this argument below, the district court's determination that Counts V and VI were separate offenses would be reviewed for clear error. *See, e.g., United States v. Prendergast*, 979 F.2d 1289, 1291–92 (8th Cir.1992) (discussing loss calculation under U.S.S.G. §§ 2B1.1 and 2F1.1 and stating, with respect to uncharged conduct, that the district court's determination of a common scheme or plan "is a factual determination subject to review under the clearly erroneous standard"); *cf. United States v. Mak*, 926 F.2d 112, 115 (1st Cir. 1991) (reviewing district court's determination of a "common scheme or plan" of drug offenses for clear error). However, because Carrington failed to raise this issue below, we review it only for plain error. *See United States v. Black*, 78 F.3d 1, 5 (1st Cir.1996); *United States v. Atwood*, 963 F.2d 476, 477 n. 2 (1st Cir.1992). While Carrington argues that this issue was preserved, pointing in his reply brief to a section of the transcript of the proceedings that shows that Counts V and VI were argued simultaneously by counsel, we reject that contention. The transcript in fact shows that Counts V and VI were argued simultaneously with respect to Carrington's section 2X1.1 attempt argument; there was no oral argument with respect to sections 2F1.1 and 2B1.1, or whether Counts V and VI formed part of a common scheme or plan.

We fail to find plain error for two reasons. First, we think Carrington's reliance on commentary to section 2B1.1 is misplaced. Carrington essentially contends that because, of the 80 victims of the fraud underlying Count VI, thirty were among the victims in Count V, and because he was seeking to get the same $150,000 from these thirty victims, the district court therefore improperly double counted this amount in calculating the loss from Count VI as $583,443.50. Carrington emphasizes Application Note 2 to section 2B1.1, which specifies that "[i]n certain cases, an offense may involve a series of transactions without a corresponding increase in loss." U.S.S.G. § 2B1.1, comment. (n.2). However, as the Government points out, the very next sentence in Note Two uses as an example the case where "a defendant [ ] embezzle[s] $5,000 from a bank and conceal[s] his embezzlement by shifting this amount from one account to another in a series of nine transactions over a six-month period." *Id.* The loss would remain at $5,000 because the subsequent transactions did not increase the risk of actual or intended loss. By contrast, there is no dispute that Carrington's actions in Count VI increased the risk of potential loss to the 30 overlapping victims. Indeed, Carrington's own counsel argued at sentencing that "[t]here was no follow-up [to the fraud in Count V], no pursuit of it, it was

abandoned and then a second, separate fraud was commenced."

■■■ Second, even if the loss on Count VI were reduced by $150,000, as Carrington seeks, the aggregate total loss for Counts I through VI would be approximately $789,000 which, under the Guidelines, would require a ten-level rather than eleven-level increase to the offense, resulting in a final adjusted offense level of 21 rather than 22. *See* U.S.S.G. § 2F1.1(b)(1). Because Carrington falls within Criminal History Category I, his sentencing range under the Guidelines would be 41–51 months. Appellant's current sentence falls within this range. This conduces to the conclusion, in the circumstances of this case, that the claimed error would not warrant us in invoking our sparingly used discretion to correct plain error.

### E. Carrington's requested "acceptance of responsibility" credit

■■■ Carrington also claims that the district court erred in denying his request for a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. As a threshold matter, we must confront the question of what standard of review applies. Carrington argues that the district court made an interpretive mistake regarding the meaning and scope of its factfinding; because this purported mistake is inextricably intertwined with its factfinding, he contends that *de novo* review is warranted. Carrington points out that the government recommended a three-level reduction for timely acceptance of responsibility, but that the district court adopted the probation office recommendation that no sentencing consideration be given. Carrington argues in his brief that the district court committed an error of interpretation and related factfinding, since "[n]o fact of any significance is referred to by [the] probation [office] other than the subsequent offense" committed while he was on pretrial release.

■■■ While Carrington claims that his argument implicates a mixed error that requires *de novo* review for his entire argument, we disagree. The propriety of the district court's use of criminal conduct during pretrial release to justify denial of acceptance of responsibility credit—as a matter of guide-line interpretation—is subject to *de novo* review. *United States v. Talladino,* 38 F.3d 1255, 1263 (1st Cir.1994). However, the application of this legal conclusion to the facts surrounding Carrington's offense is subject to review for clear error. *United States v. Boots,* 80 F.3d 580, 594 (1st Cir.1996); *United States v. Luciano–Mosquera,* 63 F.3d 1142, 1158 (1st Cir.1995). We cannot accept the proposition that the district court erred as a matter of law by denying Carrington acceptance of responsibility credit based on his criminal conduct (included in Counts V and VI) while on pretrial release. The Guidelines specify that a court, in its acceptance of responsibility determination, can consider whether the defendant has voluntarily terminated all criminal conduct. *See* U.S.S.G. § 3E1.1, comment. (n.1). Where the defendant commits additional crimes while on release, a district court may view that as evidence that the defendant has not voluntarily terminated all criminal conduct and, accordingly, decline to award a reduction for acceptance of responsibility on that ground alone. *United States v. O'Neil,* 936 F.2d 599, 600 (1st Cir.1991). This is true even where the defendant, like Carrington, has pled guilty. *Id.* at 600–01; *see also United States v. Morrison,* 983 F.2d 730 (6th Cir.1993); *United States v. Reed,* 951 F.2d 97, 99 (6th Cir.1991), *cert. denied,* 503 U.S. 996, 112 S.Ct. 1700, 118 L.Ed.2d 409 (1992). As a result, we conclude that the district court did not commit legal error in considering Carrington's criminal conduct while on pretrial release.

■■■ Accordingly, we review for clear error Carrington's residual argument regarding the district court's refusal to grant him a reduction for acceptance of responsibility. *See, e.g., United States v. Burns,* 925 F.2d 18, 20 (1st Cir.1991); *United States v. Royer,* 895 F.2d 28, 29 (1st Cir.1990). "Because credibility and demeanor play a crucial role in determining whether a person is genuinely contrite, and because the sentencing judge has the unique opportunity of observing the defendant ... and evaluating acceptance of responsibility in a live context, the finding of the sentencing court is entitled to great respect," and "should not be disturbed unless it

is without foundation." *Burns,* 925 F.2d at 20; *Royer,* 895 F.2d at 29–30. In his brief, Carrington argues that, in its weighing of his additional offenses versus the affirmative steps Carrington has taken to admit guilt and accept responsibility for his crimes, the trial court ignored his remorse and "cho[se] instead to focus solely on the commission of a new offense (for which a three point enhancement was assessed without objection)." While Carrington may state a plausible theory under which the district court could have decided to give him acceptance of responsibility credit *despite* his commission of new offenses, he has simply not met his burden, *see United States v. Uricoechea-Casallas,* 946 F.2d 162, 167 (1st Cir.1991), of showing that the district court's decision was "without foundation," *see Burns,* 925 F.2d at 20. Furthermore, in addition to his additional offenses, the district court also considered Carrington's decision to remain silent in open court, a factor the court was entitled to weigh in determining whether he demonstrated an acceptance of responsibility. *See United States v. Delgado Munoz,* 36 F.3d 1229, 1236 (1st Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1164, 130 L.Ed.2d 1120 (1995). Because the district court had sufficient foundation to do so, we affirm its denial of Carrington's request for a three-level reduction based on his acceptance of responsibility.

### III. *CONCLUSION*

As a result of the foregoing, the judgment of the district court is ***affirmed.***