RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0409P (6th Cir.)
File Name: 01a0409p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　　*v.*

SELENA TURNER (99-1640);
EDWARD JAMES (99-1762);
KEVIN LARKINS (99-2013),
　　　*Defendants-Appellants.*

Nos. 99-1640/
1762/2013

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-80041—Julian A. Cook, Jr., Senior District Judge.

Argued: March 8, 2001

Decided and Filed: November 28, 2001

Before: SILER, MOORE, and CLAY, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Tracey D. Weaver, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, Kevin M. Schad, SCHAD & COOK, Cincinnati, Ohio, Douglas R. Mullkoff, Ann Arbor, Michigan, for Appellants. Jonathan Tukel, ASSISTANT UNITED STATES ATTORNEY, Detroit,

1

Michigan, for Appellee.  **ON BRIEF:**  Andrew N. Wise, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, Kevin M. Schad, SCHAD & COOK, Cincinnati, Ohio, Douglas R. Mullkoff, Ann Arbor, Michigan, for Appellants.   Jonathan Tukel, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

SILER, J., delivered the opinion of the court, in which CLAY, J., joined.  MOORE, J. (p. 18), delivered a separate concurring opinion.

---

## OPINION

---

**SILER**, Circuit Judge.   Defendants Selena Turner and Kevin Larkins appeal their convictions after trial on conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951.   Edward James appeals his § 1951 conviction and sentence following his guilty plea to the conspiracy charge.   For the reasons stated hereafter, we **REVERSE** Turner's and Larkins's convictions and **AFFIRM** James's conviction and sentence.

## I.  BACKGROUND

This case arises from a conspiracy by three Detroit police officers, James, Larkins, and Vernon Gentry, and a civilian, Turner, to rob Sterling Talley.   Talley, Turner's former boyfriend and housemate, conducted an illegal lottery in which approximately three runners he employed took bets on the winning numbers for the Ohio and Michigan lotteries. The runners would collect bets from bars, automobile plants and other places of employment in and around Detroit. Individual bettors could phone bets to Talley's home and runners transported or faxed bets to his home.   Talley paid individuals who had picked the winning Ohio and Michigan lottery numbers at slightly higher odds than the states.

---

## CONCURRENCE

---

KAREN NELSON MOORE, Circuit Judge, concurring. I write separately to emphasize that there are many ways that the government could have established the requisite interstate commerce nexus in this case, some of which are described in Judge Siler's opinion. The trial occurred before the decision by a panel of this court in *United States v. Wang*, 222 F.3d 234 (6th Cir. 2000), and the government was not able to foresee the distinctions drawn in that case between the robbery of private citizens connected with a business and the robbery of the business. Had the government known of the law of the circuit later set forth in *Wang*, it probably could easily have shown the connection with interstate commerce. We cannot speculate, however, and therefore I agree on the reversal of Turner's and Larkin's convictions.

Talley's business did not involve the use of legitimate lottery tickets.

Talley had previously been convicted of tax evasion because he had not reported his illegal gambling proceeds as income. Notably, however, there is no indication that he has been prosecuted for conducting an illegal gambling business in violation of 18 U.S.C. § 1955.[1]

Turner lived with Talley for awhile. After breaking up with Talley and moving out of his home, Turner believed that he owed her money and devised a plan to have her cousin, James, rob him. Turner informed James that Talley kept large amounts of money in his house. The defendants estimated that Talley had between one and two million dollars in his home. James recruited Gentry to assist him.

After an aborted attempt to rob Talley on the street, Gentry and James came up with a plan to rob his home. They recruited Larkins to assist them. They also sought the assistance of Darwin Roache, another Detroit police officer who feigned interest in joining the conspiracy, but agreed to work undercover. Roache recorded several conversations in which he and the other officers discussed how the robbery would be carried out. The plan called for the officers to pose

---

[1] 18 U.S.C. § 1955 "criminalizes illegal gambling operations of a certain size." *United States v. Wall*, 92 F.3d 1444, 1445 (6th Cir. 1996). The statute limits its reach by defining an illegal gambling business, in part, as follows:

> (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
> (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955(b)(1)(ii) and (iii). The limits of § 1955 insure a proper exercise of Congressional interstate commerce authority. *See Wall*, 92 F.3d at 1449-51. Talley testified that he employed three runners in his illegal gambling operation, and thus a total of four persons were involved in its operation, taking it out of § 1955 coverage.

as federal agents and stage a raid of Talley's house, restrain those inside, and take the money.

On the morning the robbery was to be carried out, the FBI and Detroit police officers arrested Larkins, James, Gentry and Turner and executed search warrants. The officers seized police clothing, duct tape, cable ties, a stolen pistol and other items that were to be used to carry out the robbery. The FBI also executed a search warrant of Talley's home and seized more than $400,000 in cash — the proceeds from Talley's illegal gambling activity.

The four were indicted for conspiracy to commit robbery in violation of the Hobbs Act and the officers were charged with using or carrying a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). James and Gentry entered guilty pleas. Larkins stood trial by himself in 1998. The trial resulted in an acquittal on the firearm charge and a hung jury and mistrial on the Hobbs Act conspiracy charge. In 1999, Larkins and Turner were tried together and found guilty on the conspiracy charge.

The district court sentenced James to a 108 month term of imprisonment. Larkins and Turner were sentenced to121 month terms of imprisonment. Gentry's conviction is not before this court.

## II. DISCUSSION

Turner and Larkins argue that the district court erred in denying their Rule 29 motions for judgments of acquittal because the government did not establish that the conspiracy could have affected interstate commerce. James argues that his guilty plea was invalid because the government failed to produce an adequate factual basis upon which the district court could conclude it had "jurisdiction" under the Hobbs Act.

*United States v. Latouf*, 132 F.3d 320, 331 (6th Cir.1997), *cert. denied*, 523 U.S. 1101 (1998)).

The district court did not commit clear error in making the factual determination that James intended to use his skills as a police officer to commit the robbery. Among the evidence the district court relied upon in making this enhancement was the specific finding that James intended to use his police training and planned to show his badge at the scene in order to control the situation. This specific finding demonstrates that James intended to use his "special skills" as a police officer to effect the robbery.

The convictions of Turner and Larkins are REVERSED. The conviction and sentence of James are AFFIRMED.

*Henderson*, 411 U.S. 258, 267 (1973); *United States v. Davis*, 900 F.2d 1524, 1525-26 (6th Cir.1990). To successfully challenge the district court's jurisdiction, a defendant who enters a guilty plea must establish that the face of the indictment failed to charge the elements of a federal offense. *See Mack v. United States*, 853 F.2d 585, 586 (8th Cir. 1988). James does not contend that the indictment was insufficient to confer jurisdiction upon the district court.

Although the Hobbs Act's interstate commerce element is commonly referred to as a "jurisdictional element," the failure of the government to prove a nexus between the crime and interstate commerce is not jurisdictional in a sense that it deprives the district court of subject matter jurisdiction. *See United States v. Robinson*, 119 F.3d 1205, 1212 n.4 (5th Cir. 1997); *cf. United States v. Hassan*, 230 F.3d 1360, 2000 WL 1477967, *2 (6th Cir. Sept. 26, 2000)(unpublished)(interstate commerce element in 18 U.S.C. § 1029 is "not jurisdictional in a sense that it affects a court's subject matter jurisdiction, i.e., a court's constitutional or statutory power to adjudicate a case."). Through his guilty plea, James admitted the factual basis for jurisdiction as charged in his indictment. Thus, James's challenge is nonjurisdictional and has been waived.

James also contends that the district court erred by enhancing his sentence for use of a "special skill" pursuant to USSG § 3B1.3. He argues that the facts do not demonstrate that he used his special skills as police officer "in a manner that significantly facilitated the commission or concealment of the offense." The district court found that "there was a great deal of evidence which indicated that Mr. Larkins along with James and Gentry intended to use their status and training and education as police officers to effect the robbery."

"The sentencing court's factual findings in relation to application of the Sentencing Guidelines are subject to the deferential 'clearly erroneous' standard of review." *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000) (citing

### A. Standard of Review

"A Rule 29 motion is a challenge to the sufficiency of the evidence." *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996). This court reviews the sufficiency of the evidence supporting the convictions of Larkins and Turner "by determining 'whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wang*, 222 F.3d 234, 237 (6th Cir. 2000) (quoting *United States v. Brown*, 959 F.2d 63, 67 (6th Cir. 1992), in turn quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

This court explained the standard of review applicable to James's appeal in *United States v. Tunning*, 69 F.3d 107 (6th Cir. 1995), as follows:

In *McCarthy v. United States*, 394 U.S. 459 (1969), the Supreme Court adopted a rule of strict compliance with the procedures of Rule 11. This rule was modified in 1983 with the adoption of Rule 11(h), which provides that variations from the requirements of Rule 11 are excusable so long as they do not affect the "substantial rights" of the defendant. However, this "harmless error" analysis does not apply to appellate review of the sufficiency of the factual basis supporting the guilty plea. "'[W]hile the exact method of producing a factual basis on the record is subject to a flexible standard of review, the need to have some factual basis will continue to be a rule subject to no exceptions.'"

*Id*. at 111 (quoting *United States v. Goldberg*, 862 F.2d 101, 106 (6th Cir. 1988), in turn quoting *United States v. Fountain*, 777 F.2d 351, 357 (7th Cir.1985), *cert. denied*, 475 U.S. 1029 (1986)).

## B. Sufficiency of the Evidence

The Hobbs Act, 18 U.S.C. § 1951, provides, in relevant part:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

"In order to prevail under a Hobbs Act violation, the Government must prove two elements: 1) interference with interstate commerce, which is a jurisdictional issue; and, 2) the substantive criminal act, which in the instant case is [a conspiracy to commit] robbery." *Wang*, 222 F.3d at 243-44 (Hood, J., concurring) (citing *Stirone v. United States*, 361 U.S. 212, 218 (1960)). When a conspiracy is charged under the Hobbs Act, the government need only prove that the scheme would have affected interstate commerce had it been carried out. *See United States v. DiCarlantonio*, 870 F.2d 1058, 1061 (6th Cir.1989).

In denying the Rule 29 motions of Larkins and Turner, the district court stated that their argument with regard to the lack of proof of an effect on interstate commerce "must be rejected because of the large amount of money that the government contends that the defendants and others intended to steal from Sterling Talley, would, by its nature have had an affect [*sic*] on interstate commerce." This approach reflects the government's arguments and the scant amount of evidence presented concerning the interstate commerce element of the charges. The government's theory of proof on the interstate commerce element relies upon a portion of *United States v. Collins*, 40 F.3d 95, 100 (5th Cir. 1994), where the court held that:

commerce in preparation for or during the commission of a robbery. For example, unless the robber raised sheep or cotton plants and converted wool or cotton into clothing, or perhaps robbed in the nude, interstate commerce would be affected by the utilization of clothing that had moved in interstate commerce during a robbery. Likewise, under the government's theory, if a robber came to or from the scene of the crime, or surveyed the scene prior to the crime in an automobile, which had been moved at some time through interstate commerce, the crime would be covered under the Hobbs Act. More important than these examples, however, is the fact that this method or theory of proving the interstate commerce element in a Hobbs Act case has not been utilized or affirmed in this or, as far as we can tell, any other circuit.

As the government failed to produce evidence to show that the defendants conspired to target a business engaged in or affecting interstate commerce, a connection between Talley and a business engaged in interstate commerce, and failed to offer evidence explaining how robbing him of a large sum would have affected interstate commerce, no rational trier of fact could have found the interstate commerce element beyond a reasonable doubt. Accordingly, the convictions of Turner and Larkins are reversed.

## C. James's Guilty Plea

James argues that the factual basis for his guilty plea was insufficient because it did not support "federal jurisdiction." During his sentencing the government stated that it was prepared to prove the interstate commerce element by showing the conspiracy to commit the substantive crime, that the defendants believed that there was approximately one million dollars in Talley's house, and that they had purchased items that moved in interstate commerce in preparation for the crime.

James' unconditional guilty plea waives all nonjurisdictional defenses to his conviction. *See Tollett v.*

While this language is arguably *dicta*, it nonetheless reflects the proper method to prove how a conspiracy to rob a large sum of money could have affected interstate commerce. The *Farrell* court had evidence before it that demonstrated how the large amount extorted *had* or could have further affected interstate commerce — i.e., how the potential effect was or could have been realized. *Id*. at 875-876; *cf*. *Mills*, 204 F.3d at 672 (co-conspirator knew that Hobbs Act victims would have borrowed bribe from a loan or credit card company engaged in interstate lending). No such evidence was produced here.

Talley testified that the cash sought by the defendants would have been used to pay winning bettors. He did not testify about how he would have paid winning bettors had the robbery occurred. He did not testify that had he been robbed of this cash he would have borrowed money from an interstate lender as in *Mills*, or made a claim against a bank or pledged stock as in *Farrell*. The government failed to present other evidence showing how interstate commerce would have been affected or utilized to make up for the lost amount.

As the *Wang* court noted, "[t]he Constitution requires a distinction between what is truly national and what is truly local." *Id*. at 240. The government's reliance on the fact that a large amount of money was the goal of the conspiracy, without connecting this fact to an effect on interstate commerce, ignores this distinction because this theory's reasoning would "acknowledge a general federal police power with respect to" any conspiracy to rob large sums of money. *Id*.

The government's other theory with regard to the interstate commerce element points to evidence showing that the defendants purchased items that traveled in interstate commerce in their preparations to rob Talley. This theory casts a wide net that obliterates the distinction between Hobbs Act and common law robbery. It is difficult to fathom how any robber could fail to utilize items that traveled in interstate

Criminal acts directed toward individuals may violate section 1951(a) only if: (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some "cumulative effect on interstate commerce."

*Id*. The government contends its proof was consistent with example three. The *Collins* court relied upon *United States v. Farrell*, 877 F.2d 870 (11th Cir. 1989), in part, when enunciating test three, but it did not elaborate on the specifics of what evidence was sufficient to meet the test, as it was unnecessary to the resolution of the case. *Collins*, 40 F.3d at 100.

In *Farrell*, the court held that a $1,540,000 extortion demand was so high that it "would have affected interstate commerce to a legally cognizable degree." *Id*. at 875-876. However, the *Farrell* court relied, in part, upon evidence showing that if the extortion scheme had succeeded, the Farrells would have made a claim against a bank, a direct effect on interstate commerce. *Id*. It also noted additional evidence showing that they had already pledged stock to meet the demand, thus obstructing the stock's trade, i.e., its trade in interstate commerce. *Id*. It was this evidence that connected the large amount of money to an effect on interstate commerce.

The government argues that its proof of the size of the sum at stake was sufficient to show that had the robbery been carried out there would have been "some cumulative effect on interstate commerce." *United States v. Quigley*, 53 F.3d 909, 910 (8th Cir. 1995).

In *Wang*, the owners of a restaurant, who regularly purchased items that traveled in interstate commerce for their

business, were robbed of that day's business proceeds, and other monies, after returning to their home. *Id*. at 236. In deciding whether the government had presented sufficient evidence to prove the interstate commerce element, the *Wang* court first noted that in Hobbs Act prosecutions involving business establishment victims, the government only need to show a *de minimis*[2] impact on interstate commerce. *Id*. at 237. It then analyzed this approach in light of *United States v. Lopez*, 514 U.S. 549 (1995), and held that the *de minimis* effects standard in Hobbs Act prosecutions involving business victims was still valid. *Id*. at 239. However, the *Wang* court also held that a greater showing was required in Hobbs Act prosecutions involving private citizen victims. *Id*. at 239-40.

In its discussion, the *Wang* court mentioned the three tests of *Collins*, and then stated:

> This is not to say that criminal acts directed at private citizens will never create jurisdiction under the Hobbs Act. The federal courts have acknowledged, for example, that victimization of a large number of individuals, or victimization of a single individual for a very large sum, can have the *potential* directly to affect interstate commerce. *See*, e.g., *United States v. Farrell*, 877 F.2d 870, 875-76 (11th Cir.1989) (holding that extortion demand of $1,540,000 "would have affected interstate commerce to a legally cognizable degree"). But when the Government seeks to satisfy the Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate

_____

[2] "Traditionally, the government meets the *de minimis* standard [in a Hobbs Act case] under the 'depletion of assets' theory. The government presents evidence that a business is either actively engaged in interstate commerce or customarily purchases items in interstate commerce, and had its assets depleted by the robbery, thereby curtailing the business' potential as a purchaser of such goods." *United States v. Peterson*, 236 F.3d 848, 854 (7th Cir. 2001); *see also Wang*, 222 F.3d at 237.

information is widely available through various forms of media, the exposure to which the average citizen can hardly avoid on a day-to-day basis. No evidence suggests that Talley's operation reached out to, or crossed over the Michigan border into, Ohio.

The evidence elicited by the government indicates that it initially sought to show that Talley's business was engaged in or affected interstate commerce, but it also appears that this approach was abandoned. This foreclosed the possibility of showing that the robbery could have had a *de minimis* effect on a business engaged in interstate commerce under the "depletion of assets" theory and also made any possible link between the conspiracy to rob Talley, as an individual victim, and an effect on a business engaged in interstate commerce fortuitous and speculative.

The jury was left with evidence showing the amount of money that the defendants thought Talley had, with no evidence related to how the depletion of the money would have affected interstate commerce. The government argues that this evidence alone was sufficient to satisfy the Hobbs Act's interstate commerce element pursuant to *Collins*. It also contends that since the defendants purchased items that traveled in interstate commerce to use for the robbery, the conspiracy affected interstate commerce.

There is simply no evidence in the record showing that a "potential" effect on interstate commerce would have been realized if the robbery had been committed. *Wang*, 222 F.3d at 239. Although the *Wang* court noted the tests of the *Collins* decision and discussed their application by an examination of *Farrell*, these cases do not stand for the proposition that the government only has the burden to show the mere fact that a large amount of an individual's money was targeted to satisfy the Hobbs Act's interstate commerce element. As quoted above, the "victimization of a single individual for a very large sum" has the *potential* to affect interstate commerce. *Id*. (emphasis added).

The government's proof did not show a connection between Talley and a business engaged in interstate commerce. In fact, the lack of evidence the government produced in this regard makes it unclear whether the government attempted to make such a showing. The testimony the government elicited from Talley regarding his gambling business[4] was suggestive of an attempt to demonstrate the effect the robbery would have on it, ignoring him as an individual victim, but it appears that this attempt was aborted. The government did not elicit testimony showing whether his illegal business was engaged in interstate commerce, or somehow affected interstate commerce, through regular purchasing or otherwise. As noted above, Talley has not been convicted for conducting an illegal gambling business under 18 U.S.C. § 1955. In § 1955, Congress went to great lengths ("§ 1955 contains reams of legislative historical information to guide the courts," *Wall*, 92 F.3d at 1450) to find that illegal gambling operations *of a certain size* could affect interstate commerce.[5] Talley's winning numbers in his gambling operation were based upon the winning lottery numbers of Michigan and Ohio, but such

---

**4**The government asked Talley questions that suggest that it sought to show that the robbery would have affected his gambling business or that the business affected interstate commerce. These questions are paraphrased as follows: (1) if he allowed patrons of his "lottery business" to bet on both Michigan and Ohio numbers; (2) if people could send in their bets by phone or fax; (3) if the money seized from his house in a previous IRS raid was used to pay gambling winnings; (4) if and how much he paid workers who assisted in his "lottery business"; and (5) if the money seized from him near the time of the arrests in this case was used to pay gambling winnings and if that money had been stolen whether he would have been able to pay gambling winnings on the day of the robbery. While some of these questions suggest a link between the business and interstate commerce, no additional evidence was produced to show the link.

**5**The consideration of this fact is not meant to suggest that the government may satisfy the Hobbs Act's interstate commerce element by merely relying on Congressional findings in unrelated statutes that a particular type of business typically engages in or affects interstate commerce. *See Peterson*, 236 F.3d at 855.

commerce, that connection must be a substantial one — not one that is fortuitous or speculative.

*Id.* (emphasis added).

Thus, when a Hobbs Act conviction involves the victimization of a business establishment, the *de minimis* standard remains applicable. The *Wang* court did not limit the methods by which the government can connect a private citizen victim to an effect on interstate commerce in a Hobbs Act case. *See id.* at 240. However, the examples it listed are helpful here because the government's proof, albeit limited and ambiguous with regard to showing an effect on interstate commerce or whether the government considered Talley or his business the potential victim of the conspiracy, bears some resemblance to them.

First, the *Wang* court noted that the "victimization of a large number of individuals, or victimization of a single individual for a very large sum, can have the potential directly to affect interstate commerce." *Id.* at 239 (citing *Farrell*, 877 F.2d at 875-76 (11th Cir.1989)). This approach was applied more narrowly by the *Farrell* court than in *Collins*, and was supported by specific proof that the victim's loss of money would have to be recouped by way of a loan from an interstate lender and that the victims had already pledged stock. *Id.* at 875-6; *cf. United States v. Mills*, 204 F.3d 669, 670, 672 (6th Cir. 2000) (finding interstate commerce element was proved by the fact that the defendant's co-conspirator "had actual knowledge of the interstate character of the [bribe] funds," which would have come from an interstate lender or credit card company).

Second, *Wang* held that if the government seeks to prove the interstate commerce element by connecting a private citizen victim to a business engaged in interstate commerce, the connection must be a "substantial one — not one that is fortuitous or speculative." *Id.* at 239-240.

Third, *Wang* characterized the approach taken in *Mills* as an example of the government's proving the interstate commerce element "by demonstrating that the defendant knew of or was motivated by the individual victim's connection to interstate commerce." *Wang*, 222 F.3d at 240 (citing *Mills*, 204 F.3d at 670).

Of course, this case was tried before *Wang* was decided, so it is understandable that the proof presented at trial is not clear as to whether the government's theory was that the conspiracy targeted Talley, as an individual victim who possessed business proceeds in his living quarters,[3] as in *Wang*, or Talley's business, a small part of which happened to occur in his home. Consequently, the question of whether the government was required to prove either a "*de minimis* effect," *Wang*, 222 F.3d at 237, on a business engaged in interstate commerce, a substantial connection "between an individual victim and a business engaged in interstate commerce," *id*. at 240, or prove the element in some other manner applicable to individual victims, is unclear.

Under a certain set of facts, a distinction between home businesses and a home office or a portion of a home otherwise dedicated to business use could be of great importance in light of *Wang*'s different standards of proof on the interstate commerce element. The *Wang* court found that the higher level of proof was necessary under the facts presented, but resolution of any distinction between business proceeds at home and a home business was not necessary.

Here, the record shows that the core of Talley's business was conducted outside of his home by his runners and that

---

[3]Talley indicated in his testimony that he stored the proceeds from his illegal gambling business in a closet in which he kept cleaning supplies. The closet was just inside of a door that led to a garage, but there is nothing in the record that shows whether this location is in a part of his residence dedicated to conducting his business, in his living quarters, or whether such a distinction existed.

some of the business occurred in his house. There is nothing indicating, however, the full scope and manner of how he utilized his home to conduct his business. On the Rule 29 motion and on appeal, the government has argued that the mere quantity of money proved the interstate commerce element. This approach has been utilized in Hobbs Act cases involving private citizen victims. Thus, the government either tried the case considering Talley a private citizen victim, or recognizes that there is scant proof that Talley's business was engaged in or affected interstate commerce.

However, we need not decide how to characterize the victim in this case to determine the applicable standard of proof, nor could we based upon the evidence in the record. As explained more fully *infra*, the government's proof was insufficient to prove the interstate commerce element under any theory applicable to this case. A *de minimis* effect on interstate commerce was not shown here because the government did not show that Talley's business affected interstate commerce. In other words, the government's proof did not support a "depletion of assets" theory, because that approach is predicated upon proof that the targeted business was actively engaged in interstate commerce or regularly purchased items therefrom and that the robbery would have hindered its ability to do so. The government's proof showing that the defendants purchased items that traveled interstate in preparation for the robbery is likewise insufficient to show a *de minimus* effect. Because the government did not connect Talley's business to an effect on interstate commerce, it could not show that Talley, as an individual victim, had a substantial connection to "a business engaged in interstate commerce," *id*., or that the defendants were motivated by Talley's connection to interstate commerce. *Id*. Finally, evidence of the mere size of the loot is insufficient to prove the interstate commerce element of a Hobbs Act prosecution unless it is accompanied by further proof of how the depletion of such an amount would have resulted in an effect on interstate commerce.