**UNITED STATES of America,**
**Appellee,**

v.

**James R. DOWNING, Defendant,**

**Samuel Ward, Daniel Drucker,**
**Defendants–Appellants.**

**Docket Nos. 01–1437, 01–1485.**

United States Court of Appeals,
Second Circuit.

Argued: April 30, 2002.

Decided: July 1, 2002.

Diarmuid White, White & White (Brendan White, of counsel), New York, NY, for Defendant–Appellant Daniel Drucker.

Howard L. Jacobs, New York, NY, for Defendant–Appellant Samuel Ward.

Christopher J. Clark, Assistant United States Attorney (Christine H. Chung, Assistant United States Attorney, of counsel; James B. Comey, United States Attorney for the Southern District of New York), New York, NY, for Appellee United States of America.

Before: MINER and SACK, Circuit Judges, and BERMAN, District Judge.*

SACK, Circuit Judge.

Samuel Ward, a certified public accountant and principal of the accounting firm S.M. Ward Co., and Daniel Drucker, a former employee of Ward's firm, appeal their convictions and respective sentences imposed by the United States District Court for the Southern District of New York (Kevin Thomas Duffy, *Judge*) after a jury found them guilty of conspiracy to commit wire fraud and securities fraud. Ward and Drucker appeal on many grounds, all but one of which we find to be without merit. We write primarily to clarify the application of two sections of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"): (1)

* The Honorable Richard M. Berman, of the United States District Court for the Southern District of New York, sitting by designation.

U.S.S.G. § 2X1.1(b)(2),[1] which prescribes a three-level downward adjustment for certain conspiracy convictions; and (2) U.S.S.G. § 3B1.3, which prescribes a two-level upward adjustment "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." We hold that the district court erred by declining to apply a three-level downward adjustment under § 2X1.1(b)(2), but properly increased the defendants' base offense level by two pursuant to § 3B1.3. We therefore affirm in part, reverse in part, and remand for the district court to resentence the defendants with the benefit of this adjustment.

## BACKGROUND

Jeffrey Pokross, an investment banker, James Downing, owner of the privately held corporation SearchHispanic.com, Inc. ("SearchHispanic"), and several others conspired to perpetrate a "pump and dump" scheme. "Pump and dump," according to the government, denotes a stock-market manipulation scheme in which "the schemers [first] artificially inflate, or 'pump,' the price of [a] stock by bribing stock promoters to sell it, and [then] 'dump' the stock once the price [becomes] sufficiently high." Appellee's Br. at 3.

To accomplish this scheme, the conspirators intended, as a first step, to merge SearchHispanic into the publicly traded shell corporation GTrade Networks, Ltd. ("GTrade"), an offshore company controlled by unindicted coconspirator Andy Mann. GTrade had previously been listed on the Over–The–Counter Bulletin Board exchange ("OTCBB"), but had been removed from the OTCBB register because of its failure to comply with an antifraud rule promulgated by the National Association of Securities Dealers, Inc.

To restore GTrade to the OTCBB register following the merger between SearchHispanic and GTrade—a preliminary step toward the execution of the pump-and-dump scheme—the conspirators needed unqualified audit reports for each company. Because truly independent auditors would be highly unlikely to furnish such opinions, the conspirators needed the help of compliant accountants in order to carry out the scheme successfully. The conspirators identified Ward as the principal accountant upon whom they could rely to produce the unqualified reports. According to evidence admitted at trial pursuant to Fed.R.Evid. 404(b), Ward had in 1999 "furnished false financial statements" in connection with a similar pump-and-dump scheme (the "Jackpot Scheme"). *See* Appellee's Br. at 11. To ensure that the reports on GTrade and SearchHispanic appeared independent, Ward recruited his employee Drucker to produce one of the reports on separate letterhead. The conspirators reasoned that if Ward issued the purportedly unqualified audit reports for both premerger entities—GTrade and SearchHispanic—potential investors would likely become suspicious.

Unbeknownst to the other conspirators, Pokross had been arrested previously for offenses of a similar nature, and on December 4, 1998, had agreed as part of a plea agreement with respect to those offenses to cooperate with the government as an informant. With his help, the government installed an audio eavesdropping device in Pokross's office, and

1. All citations to the United States Sentencing Guidelines Manual refer to the edition effective November 1, 2000, which, the parties do not dispute, applies to the defendants' sentences.

over a period of several months, recorded conversations among the conspirators that illuminated the nature and scope of the conspiracy. On May 2, 2000, the conspirators, including the two accountants, met in Pokross's offices, where they discussed the scheme and the roles to be played by Ward and Drucker. On June 14, 2000, the government arrested Ward, Drucker, and Downing. Downing subsequently pled guilty to a conspiracy charge. On January 26, 2001, following a ten-day trial, a jury convicted Ward and Drucker of conspiracy to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371.

On July 31, 2001, the district court sentenced Ward to forty-six months' imprisonment. The court rejected Ward's argument that he qualified for a three-level reduction to his base offense level under U.S.S.G. § 2X1.1(b)(2) because the conspiracy "did not ˙go very far." Drucker also requested a downward adjustment under § 2X1.1(b)(2). He further contended that because he never in fact used his "special skill," accounting, to facilitate the offense of conviction, the district court should not impose the two-level upward adjustment prescribed by U.S.S.G. § 3B1.3. The court rejected both arguments, and on September 5, 2001, sentenced Drucker to thirty-three months' incarceration.

Both defendants appeal, challenging their convictions and sentences on multiple grounds. They contend, *inter alia*, that the district court erred by refusing to apply § 2X1.1(b)(2) and by applying § 3B1.3.

## DISCUSSION

### I. Sufficiency of the Evidence

Both defendants argue that the evidence did not suffice to support their convictions insofar as it failed to establish their awareness of the conspiracy's object: to commit wire fraud and securities fraud. Drucker alone maintains that the evidence also failed to establish that he ever agreed to issue false audit reports. He avers that he "believe[d] in good faith" that his and Ward's opinions "would be rendered independently." Appellant Drucker's Br. at 44. Finally, both Ward and Drucker argue that the district court erred by admitting evidence pursuant to Fed.R.Evid. 404(b) of Ward's involvement in a previous pump-and-dump operation. The district court admitted this evidence solely against Ward, for the purpose of showing his knowledge or intent.

### A. *Standard of Review*

We review challenges to the sufficiency of the evidence underlying a criminal conviction "in the light most favorable to the government," crediting "every inference that could have been drawn in its favor." *United States v. Diaz*, 176 F.3d 52, 89 (2d Cir.), *cert. denied*, 528 U.S. 875, 120 S.Ct. 181, 145 L.Ed.2d 153 (1999). Our inquiry is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). To answer this question, we review the evidence as a whole, *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir.), *cert. denied*, 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998), and "resolv[e] all issues of credibility in the government's favor," *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir.), *cert. denied*, 525 U.S. 1009, 119 S.Ct. 527, 142 L.Ed.2d 437 (1998). We will not overturn a jury verdict "merely because [an] exculpatory account is plausible." *United States v. Friedman*, 998 F.2d 53, 56 (2d Cir.1993); *accord Abelis*, 146 F.3d at 80 (emphasizing that the "government need not disprove every possible hypothesis of

innocence" and that "the jury may properly base its verdict upon inferences from circumstantial evidence") (internal quotation marks omitted). Finally, "[w]e must be especially deferential when reviewing a conspiracy conviction." *United States v. Mulder,* 273 F.3d 91, 109 (2d Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1344, 152 L.Ed.2d 247 (2002); *accord United States v. Pitre,* 960 F.2d 1112, 1121 (2d Cir.1992). "[A] conspiracy by its very nature is a secretive operation, and it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* (quoting *United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980)).

## B. The Elements of Conspiracy

■■■ To prove the crime of conspiracy, 18 U.S.C. § 371, the government must establish:

> (1) that the defendant agreed with at least one other person to commit an offense; (2) [that] the defendant knowingly participated in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and (3) that during the existence of the conspiracy, at least one of the overt acts set forth in the indictment was committed by one or more of the members of the conspiracy....

*United States v. Salameh,* 152 F.3d 88, 145 (2d Cir.1998), *cert. denied,* 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999). The conspiratorial agreement need not be "formal or express." *United States v. Amato,* 15 F.3d 230, 235 (2d Cir.1994). The government may prove its existence by circumstantial evidence, *Desimone,* 119 F.3d at 223, provided such evidence establishes beyond a reasonable doubt the defendants' knowledge of "the essential nature of the plan and their connections with

it," *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947). The government need not prove that the defendants knew the details of the conspiratorial scheme or the identities of all of the conspirators. *Id.*

## C. Analysis

■■■ Applying the foregoing standards, we have no difficulty concluding that the evidence sufficed to support the defendants' convictions. Ward concedes that he "agreed with others to violate accounting standards in the preparation of the GTrade and Search[Hispanic] audited financial statements." Appellant Ward's Br. at 12–13. He argues, however, that no evidence established his knowledge of the specific pump-and-dump scheme for which he was convicted. *Id.* at 13. But as noted, the government was not required to establish Ward's knowledge of the details of that scheme; it sufficed that the evidence showed that he understood its essential nature. *See Blumenthal,* 332 U.S. at 557, 68 S.Ct. 248. The government introduced evidence specifically designed to refute Ward's contention that he lacked this understanding, in particular, that Ward actively participated in the substantially similar "Jackpot Scheme." The government also introduced direct and circumstantial evidence of Ward's knowledge, including transcripts of his conversations with coconspirators about the conspiracy, and conversations among other conspirators in which they referred expressly to Ward's role in the scheme. We therefore have no doubt that a rational juror could have concluded that Ward understood "the essential nature of the plan." *Id.* at 557, 68 S.Ct. 248. That is all the law requires. *See United States v. Benjamin,* 328 F.2d 854, 864 (2d Cir.) (Friendly, J.) (finding an accountant's awareness of "the part of the [securities fraud] scheme that involved the sale of unregistered shares" to be "immaterial" to

his liability because his acts in furtherance of the conspiracy "were essential steps in a single scheme to dupe" and part of "an integrated financial fraud"), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964).

Drucker, whom Ward recruited into the conspiracy at a later stage, plainly played a more attenuated role in the scheme. But we cannot say that no rational juror could find beyond a reasonable doubt that Drucker, too, understood its essential nature. *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. Pursuant to the hearsay exception codified at Fed.R.Evid. 801(d)(2)(E), which allows one coconspirator's statement to be offered against another for the truth of the matter asserted, the government properly introduced Ward's statement that Drucker was to create one of the false audit reports on separate letterhead. This statement provided circumstantial evidence of Drucker's knowledge of the essential nature of the conspiracy. Drucker was also present at the May 2, 2000 meeting at which the conspirators discussed the scheme in some detail and contacted unindicted coconspirator Andy Mann to talk about the role of his offshore corporation GTrade. Based on this evidence, a rational juror could conclude that Drucker understood the essential nature of the pump-and-dump scheme. The evidence therefore was sufficient.

We also find unpersuasive Drucker's contention that he never in fact agreed to issue a false unqualified audit report. Drucker argues that his oral agreement with Pokross to make the audit report "appear" to be independent rather than "commingl[ed]" with the audit report prepared by Ward reflected his *bona fide* belief that their "opinions would be rendered independently." Appellant Drucker's Br. at 44. While that exculpatory account may be plausible, plausibility is not the standard; a rational juror could conclude otherwise. *See Abelis,* 146 F.3d at 80; *Friedman,* 998 F.2d at 56.

## II. The Rule 404(b) Evidence

Ward and Drucker next argue that the district court erroneously admitted evidence pursuant to Fed.R.Evid. 404(b) of Ward's previous participation in a similar scheme.

### A. Standard of Review

■ We review the district court's evidentiary rulings for abuse of discretion. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *accord United States v. Ramirez,* 894 F.2d 565, 569 (2d Cir.1990).

### B. Fed.R.Evid. 404(b)

■ Rule 404(b) of the Federal Rules of Evidence proscribes the use of evidence of "other crimes, wrongs, or acts" committed by the defendant "to prove the character of a person in order to show action in conformity therewith." Prior "bad-acts" evidence is admissible, however, to prove, *inter alia,* knowledge, intent, and absence of mistake. *Id.* In *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), the Supreme Court articulated a four-part test to guide judicial discretion under Rule 404(b). Prior bad-acts evidence must be (1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial. In addition, (4) at the defendant's request, the district court should give the jury an appropriate limiting instruction. *Id.* at 691–92, 108 S.Ct. 1496; *see also Ramirez,* 894 F.2d at 568–69 (discussing the *Huddleston* test).

### C. Analysis

Ward concentrates his challenge on the third *Huddleston* requirement: that the

evidence be more probative than prejudicial under Fed.R.Evid. 403. Drucker, by contrast, argues that although the district court admitted the challenged evidence against Ward alone and issued a limiting instruction that the jury not consider it as to Drucker, he nonetheless suffered "spillover prejudice" so severe that it warranted a severance. We disagree with both arguments.

 Ward contended at trial that he neither knew about nor intended to facilitate any securities or wire fraud by producing false audit reports. Ward's own defense strategy therefore made evidence of his previous participation in a substantially similar scheme highly probative. That Ward previously prepared false audit reports to facilitate a securities fraud scheme tends strongly to belie his assertion that he did not understand the nature of the scheme for which he was being prosecuted. It further explains why the conspirators trusted Ward to prepare the false audit reports for GTrade and Search-Hispanic. Of course, notwithstanding the district court's admonition, the jury may have drawn an impermissible propensity inference against Ward. *See* Fed.R.Evid. 404(b). But the district court retains broad discretion to balance the evidence's potential prejudice to the defendant against its probative value. *United States v. McDermott*, 245 F.3d 133, 140 (2d Cir. 2001). For this reason, when we review the district court's judgment regarding the admissibility of a particular piece of evidence under Fed.R.Evid. 403, we generally "maximiz[e] its probative value and minimiz[e] its prejudicial effect." *Id.* (citations and internal quotation marks omitted). Applying this standard of review, we see no basis for concluding that the district court abused its discretion by admitting limited evidence of the Jackpot Scheme against Ward alone, for the purpose of showing his knowledge, intent or absence of mistake.

 Drucker concedes that the district court issued an appropriate limiting instruction directing the jury not to consider the Jackpot Scheme evidence against him. He argues, however, that his "employment relationship [with Ward] made spillover prejudice inevitable" and that the severity of this prejudice entitled him to a severance. Appellant Drucker's Br. at 52. In general, "[a] defendant seeking to overturn the denial of a severance motion … must show that he was so severely prejudiced by the joinder as to have been denied a fair trial, 'not that he might have had a better chance for acquittal at a separate trial.' " *United States v. Torres*, 901 F.2d 205, 230 (2d Cir.) (quoting *United States v. Burke*, 700 F.2d 70, 83 (2d Cir. 1983)), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Drucker cites some evidence that the prosecution referred to the Jackpot Scheme without distinguishing between Ward and Ward's *company* (S.M. Ward Co.), for which Drucker worked, thereby potentially exacerbating the prejudice to Drucker. But he asserts only in a conclusory fashion that the court's limiting instruction failed to ameliorate potential prejudice. Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions. *Zafiro v. United States*, 506 U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (emphasizing that prejudice "can be cured with proper instructions, and juries are presumed to follow their instructions") (internal quotation marks omitted); *see, e.g., United States v. Rosa*, 11 F.3d 315, 341–42 (2d Cir.1993) (affirming the denial of a severance where several defendants contended that they suffered "spillover" prejudice from evidence introduced against their codefendants), *cert. denied*, 511 U.S.

1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). Absent some basis to find that Drucker suffered severe prejudice, we conclude that the district court did not abuse its discretion by declining to grant him a severance.

### III. Sentencing Challenges

■ We review a sentencing court's findings of fact for clear error and its legal determinations *de novo*, "giving due deference to its application of the Sentencing Guidelines to the facts." *United States v. Berg*, 250 F.3d 139, 142 (2d Cir.2001).

### A. U.S.S.G. § 2X1.1(b)(2)

U.S.S.G. § 2X1.1(b)(2) directs a sentencing court to adjust a defendant's base offense level for conspiracy downward by three levels

> unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

The district court concluded that neither Ward nor Drucker merited this adjustment. The government urges us to affirm because, in its view, § 2X1.1(b)(2) does not apply if "the conspirators had completed the acts that constituted the *elements* of at least one of the substantive offenses," Appellee's Br. at 84 (emphasis in original), and "Ward and Drucker had, by May 2, 2000 [the date of their meeting with the other conspirators in Pokross's office], committed the substantive offense of mail fraud," *id.* at 85.

The government seeks support for its reading of § 2X1.1(b)(2) in *United States v. Carrington*, 96 F.3d 1 (1st Cir.1996), *cert. denied*, 520 U.S. 1150, 117 S.Ct. 1328,

137 L.Ed.2d 489 (1997). There, the First Circuit, citing its prior decision in *United States v. Egemonye*, 62 F.3d 425 (1st Cir. 1995), said that § 2X1.1(b)(2) can be read in two ways: (1) "as offering a reduction for potential versus completed harm," or (2) as applying "only where the defendant has not completed the actions necessary to the substantive offense." *Carrington*, 96 F.3d at 7. The First Circuit embraced the latter position, finding it more consistent with the general "philosophy of the guidelines." *Id.* (quoting *Egemonye*, 62 F.3d at 430); *see also Egemonye*, 62 F.3d at 429 ("Effectively, [§ 2X1.1] gives the defendant a three-level discount if he is some distance from completing the substantive crime."); *accord United States v. Sung*, 51 F.3d 92, 95–96 (7th Cir.1995) (whether § 2X1.1 applies "depends on how close the defendant came to completing [the] crimes").

The government, citing *Carrington*, maintains that even though it interrupted the pump-and-dump scheme well before Ward, Drucker, and their coconspirators completed all the acts the conspirators believed necessary for the successful completion of that scheme, Ward and Drucker nonetheless should not receive the § 2X1.1(b)(2) downward adjustment. The government reasons that by the time of their arrest, Ward and Drucker already had "completed the acts that constituted the *elements* of at least one of the substantive offenses [i.e., wire fraud or securities fraud]," Appellee's Br. at 84 (emphasis in original), and "[§ ] 2X1.1 does not apply to completed substantive offenses," *Carrington*, 96 F.3d at 8 (citing *Egemonye*, 62 F.3d at 430).

The government asserts that the elements of most fraud offenses consist of (1) "devis[ing] or intending to devise any scheme or artifice to defraud," 18 U.S.C. § 1341 (mail fraud); *id.* § 1343 (wire

fraud); *cf. id.* § 1344 (bank fraud), and (2) a *de minimis* jurisdictional element, such as the use of interstate or international wire systems in furtherance of the scheme. *See* Appellee's Br. at 84. In particular, the government contends that "the elements of wire fraud are the existence of a scheme to defraud persons of money or property and the use of interstate or international wires in furtherance of the scheme." *Id.* (citing 18 U.S.C. § 1343). Ward and Drucker committed wire fraud because "[b]y May 2, 2000, at the latest, [they] had knowingly joined a scheme to defraud people of money through the sale of stock" and "used international telephone lines to further the scheme by calling Andy Mann." *Id.* at 84–85. By similar reasoning, the government contends that Ward and Drucker committed securities fraud: "[B]y May 2, [2000, they] employed a scheme and artifice to defraud in connection with the purchase and sale of a security and used an instrumentality of interstate commerce—again, the telephone conversation with Mann—in furtherance of that scheme." *Id.* at 85. Therefore, the government concludes, the adjustment does not apply where, as (it maintains) here, the defendants completed "the substantive offense." U.S.S.G. § 2X1.1(b)(2). We find the government's position, and its reliance on *Carrington* to support this position, unpersuasive.[2]

First, we think that the government's use of the phrase "the substantive offense" begs the question: What is "the substantive offense"? During the life of a conspiracy, defendants may commit any number of offenses ancillary to that or those which constitute the object or objects of the conspiracy, but for which the government elects not to prosecute. We do not agree with the government that "the substantive offense," as used in § 2X1.1(b)(2), refers to all of these offenses because they are "substantive," however ancillary they may be to the overall object of the conspiracy for which the defendants were indicted. The Guidelines expressly state that for the purposes of § 2X1.1, " '[s]ubstantive offense' . . . means the offense that the defendant *was convicted of* soliciting, attempting, or conspiring to commit." U.S.S.G. § 2X1.1 cmt. n. 2 (emphasis added). The government did not prosecute Drucker and Ward for conspiring to commit *some* act of wire or securities fraud; it prosecuted them for conspiring to commit specific acts of fraud in furtherance of a particular scheme, namely, the pump-and-dump operation detailed in the indictment. "[T]he substantive offense" refers to the frauds constituting the object of the conspiracy charged in the indictment and of which the defendants were convicted.[3]

---

**2.** *Carrington* does not in any event hold that § 2X1.1 does not apply where "the conspirators had completed the acts that constituted the *elements* of at least one of the substantive offenses." Appellee's Br. at 84 (emphasis in original). In *Carrington*, the defendant "was convicted . . . of wire fraud, not attempted wire fraud or wire fraud conspiracy." 96 F.3d at 7. The First Circuit said only that "[§ ] 2X1.1 does not apply to completed substantive offenses." *Id.* at 8. We have no reason to dispute that proposition. But here, the government prosecuted *conspiracy* to commit wire fraud, not the substantive offense of wire fraud.

**3.** The Guidelines specifically address circumstances where "the participants . . . completed . . . all of the acts necessary for the successful completion of part, but not all, of the intended offense." U.S.S.G. § 2X1.1 cmt. n. 4. "In such cases, the offense level for the count . . . is whichever of the following is greater: the offense level for the intended offense minus 3 levels . . ., or the offense level for the part of the offense for which the necessary acts were completed . . ." *Id.* Thus, in a prosecution for theft, "where the intended offense was the theft of $800,000 but the participants completed . . . only the acts necessary to steal $30,000, the offense level [would be] the offense level for the theft of

Second, § 2X1.1(b)(2) provides a reduction to a defendant convicted of conspiracy unless "the defendant or a coconspirator completed all the acts the conspirators believed necessary on their part for the successful completion of *the* substantive offense." (Emphasis added.) Technical completion of all the "elements" of *a* substantive offense, regardless of how far the substantive offense or offenses underlying the conspiracy have progressed in time and substance, cannot, we think, be equated with "all the acts the conspirators believed necessary on their part for the successful completion of *the* substantive offense," as defined by the object of the conspiracy charged in the indictment and proved to the jury. Some defendants could commit "all the acts" required to incur liability for an ancillary substantive offense without completing "all the acts the conspirators believed necessary on their part for the successful completion of *the* substantive offense."

Here, as the government contends, Drucker and Ward may have completed the technical elements of a substantive offense of wire fraud or securities fraud, because the "elements of wire fraud are the existence of a scheme to defraud persons of money or property and the use of

interstate or international wires in furtherance of the scheme." Appellee's Br. at 84. But neither Ward nor Drucker—nor, for that matter, their coconspirators—"completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense" that formed the object of the conspiracy for which the government chose to prosecute them—the acts they believed necessary successfully to perpetrate the pump-and-dump scheme charged in the indictment and proved to the jury.[4]

This analysis does not depend on how far along Ward and Drucker were in playing their individual roles in the conspiracy. Even had they completed their roles, i.e., prepared final false audit reports, we doubt they would have been disqualified from receiving the § 2X1.1(b)(2) adjustment. The relevant question is whether the *conspiracy* "ripen[ed] into [a] substantially completed offense[ ]" or "c[a]me close enough to fruition," *United States v. Amato*, 46 F.3d 1255, 1262 (2d Cir.1995), *cert. denied*, 517 U.S. 1126, 116 S.Ct. 1365, 134 L.Ed.2d 531 (1996); *accord United States v. Martinez–Martinez*, 156 F.3d 936, 939 (9th Cir.1998) (holding that § 2X1.1 applies "unless the remaining

$800,000 minus [three] levels, or the offense level for the theft of $30,000, whichever is greater." *Id*. Section 2X1.1 therefore provides express guidance for inchoate offenses, such as conspiracy, that can be readily broken down in terms of quantity or installments, such as conspiracies to steal a certain sum of money, receive a certain quantity of purloined goods, or distribute a certain amount of narcotics. *See, e.g., United States v. Sprecher*, 988 F.2d 318, 320–21 (2d Cir.1993). That is not the case where, as here, the fraud involves an indeterminate amount and cannot readily be broken down into installments or discrete fraudulent acts. But the application of § 2X1.1(b)(2) must be determined by reference to the acts the defendants conspired to commit. *See* U.S.S.G. § 2X1.1 cmt. n. 2. Here, the government could have, but did not,

indict Ward and Drucker for conspiring to commit the *de minimis* acts of wire or securities fraud that it now argues should deprive them of the § 2X1.1(b)(2) reduction. It instead prosecuted them for their role in the conspiracy to commit the frauds constituting the pump-and-dump scheme. Those frauds constitute "the substantive offense" for purposes of applying § 2X1.1(b)(2) to these defendants.

4. In most cases the conspirators' *belief* about all the acts necessary successfully to perpetrate the substantive offense will correspond to all the acts *in fact* necessary. It is worth noting, however, that this may not be the case where, for example, the conspirators labor under a mistake of fact or law.

steps to be taken in the commission of a crime are so insubstantial that the commission of the substantive offense is inevitable, barring an unforeseen occurrence"), not whether the defendants' individual acts in furtherance of the conspiracy were substantially complete. Section 2X1.1(b)(2) does not refer to the acts of each individual defendant. *Martinez–Martinez*, 156 F.3d at 939 n. 5 ("In evaluating whether all the acts necessary for completion of the offense have occurred or are about to have occurred, the court must look at the actions of all the conspirators collectively, rather than at those of a particular defendant individually."). It is possible that the elements of one or more substantive crimes will be completed by a defendant long before the conspirators have "completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense." U.S.S.G. § 2X1.1(b)(2).[5]

Finally, we note that were a defendant ineligible for a § 2X1.2(b)(2) adjustment because of his or her completion of the "elements" of *a* substantive fraud offense,

§ 2X1.1(b)(2) would in practice be rendered largely nugatory for a not insignificant category of federal conspiracy crimes. Where a criminal statute defines the elements of fraud as devising or intending to devise a scheme to defraud and fulfilling a *de minimis* jurisdictional element, such as use of interstate wires, those elements may well be completed at an early stage in the conspiracy. In such cases, even if the defendant took only trivial acts in furtherance of the conspiracy—indeed, even if the defendant subsequently decided to withdraw from the conspiracy—he or she would be ineligible for the § 2X1.1(b)(2) reduction.

■ We conclude that the district court erred by declining to apply § 2X1.1(b)(2) to Ward and Drucker's sentences. Neither Ward nor Drucker nor "a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense." The conspiracy to carry out the pump-and-dump scheme "did not ripen into [a] substantially completed

---

5. The government's argument that a defendant's completion of the "elements" of a substantive crime *ipso facto* disqualifies him or her from eligibility for the § 2X1.1(b)(2) reduction—regardless of how far the conspiracy has progressed in time and substance—also appears to be contrary to the import of the commentary to this section. The commentary provides in pertinent part that the reduction does not apply to offenses "interrupted or prevented *on the verge of* completion by the intercession of law enforcement authorities or the victim." U.S.S.G. § 2X1.1(b)(2), background (emphasis added). This indicates that § 2X1.1(b)(2)'s applicability depends on the conspirators' "distance from completing the substantive crime," *Egemonye*, 62 F.3d at 429, not on whether the defendant may have completed the elements of an ancillary substantive crime in the course of carrying out his or her role in the conspiracy. *Compare United States v. Medina*, 74 F.3d 413, 418 (2d Cir.1996) (affirming the district court's finding that the

§ 2X1.1(b)(2) reduction should not apply where only an eleventh-hour police intervention prevented the conspirators' completion of their plan to rob a bank), *and United States v. Rosa*, 17 F.3d 1531, 1550–51 (2d Cir.) (same where the FBI apprehended defendants convicted of conspiring to receive stolen goods in the act of unloading a truck containing one installment of the total amount of stolen goods contemplated by the conspiracy, and only police intervention prevented them from receiving the remaining installments), *cert. denied*, 513 U.S. 879, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994), *with Amato*, 46 F.3d at 1262 (where the conspirators prepared extensively for a robbery, inspected the site, and made several aborted attempts, finding remand appropriate for the district court to "consider[ ] the question whether they should receive the three-level decrease provided by § 2X1.1(b)(2) for conspiracies that did not ripen into substantially completed offenses" or "come close enough to fruition").

offense[ ]" or "come close enough to fruition." *Amato*, 46 F.3d at 1262.

### B. U.S.S.G. § 3B1.3

The Sentencing Guidelines direct the district court to increase a defendant's base offense level by two "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Commentary to this section includes "accountants" among examples of persons possessing a "special skill." *Id.*, cmt. n. 3. Ward and Drucker therefore concede that for these purposes, accountants possess a "special skill." They contend, however, that § 3B1.3 should not apply to them because the conspiracy never progressed to a stage at which they used their accounting skills "in a manner that significantly facilitated the commission or concealment of the offense." The government counters that "when the crime of conviction is conspiracy, the 'special skill' enhancement is applicable so long as the defendant conspires to use his or her skill in committing the object of the conspiracy." Appellee's Br. at 89.

We agree in substance with the government. Section 3B1.3 applies to convictions for conspiracy provided the district court concludes with "reasonable certainty," U.S.S.G. § 2X1.1(a), that the defendant conspired to use "a position of public or private trust, or . . . a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.

 In general, for § 3B1.3 to apply, the government must establish: (1) that the defendant possessed a special skill or occupied a position of trust, and (2) that he or she used this skill or position "in a manner to significantly facilitate" the offense of conviction. *United States v. Gan-*

*dy*, 36 F.3d 912, 915 (10th Cir.1994) (observing that § 3B1.3 applies where the defendant: (1) possessed a special skill; and (2) used that special skill to facilitate significantly—i.e., make easier—the commission or concealment of the offense); *accord United States v. Hirsch*, 239 F.3d 221, 226–28 (2d Cir.2001). We have never specifically addressed whether and how § 3B1.3 applies to inchoate offenses, i.e., to cases where a defendant intends or plans to use a special skill or position of trust to facilitate or conceal a substantive crime, but in fact never does so.

In *United States v. Turner*, 272 F.3d 380 (6th Cir.2001), *amended by* 280 F.3d 1078 (6th Cir.2002), the Sixth Circuit affirmed the application of § 3B1.3 to a police officer who intended to use his skills, status, and training to execute a robbery. *Id.* at 390. But *Turner* contains no discussion of the general issue of § 3B1.3's application to inchoate crimes such as conspiracy. Nor do the remaining cases cited by the parties address this issue. In *United States v. Culver*, 929 F.2d 389 (8th Cir. 1991), for example, the Eighth Circuit affirmed the application of § 3B1.3 to a pilot who conspired to transport a stolen aircraft even though police arrested him "before he had an opportunity to pilot the plane." *Id.* at 393. The court observed that "skill as a pilot extends to more than actually flying the aircraft. [The defendant's] skills were required to plan for fuel, devise flight paths, and to prepare the aircraft for flight. . . ." *Id.* The court therefore applied § 3B1.3 because the pilot, unlike Ward and Drucker, had already used his "special skill," albeit not to the full extent contemplated by the conspiracy. In *United States v. Covey*, 232 F.3d 641 (8th Cir.2000), *cert. denied*, —— U.S. ——, 122 S.Ct. 39, 151 L.Ed.2d 12 (2001), the Eighth Circuit again had no occasion expressly to consider whether § 3B1.3 applies to incho-

ate offenses. The defendant, an accountant convicted of conspiring to commit money laundering, already had used his special skill in some measure before his apprehension. *See id.* at 646–47.

■ Despite the absence of binding precedent in our case law, we conclude, on the basis of general principles set forth in the Guidelines and the approach to similar cases taken by other circuits, that U.S.S.G. § 3B1.3, like most specific offense characteristics, applies to inchoate offenses provided the court determines with reasonable certainty that the defendant actually intended to use his or her special skill or position of trust to facilitate or conceal significantly the corresponding substantive offense. Section 2X1.1 instructs that unless specifically addressed elsewhere in the Guidelines, sentences for inchoate crimes should correspond to those for the substantive offenses. *See* U.S.S.G. § 2X1.1(c)(1). The base offense levels for conspiracy, attempt, and solicitation are established at the level applicable to the corresponding substantive offenses "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." *Id.* § 2X1.1(a).

But when specific offense characteristics have not actually occurred, they should be applied only if the district court determines that they were "specifically intended." *Id.*, cmt. n. 2. In sentencing a defendant for conspiracy to commit bank robbery, for example, the Guidelines state that an adjustment based on an aggravating factor, such as physical restraint, should not be applied unless "it was established that the defendants actually intended to physically restrain the teller." *Id.*

Based on the language of the Guidelines and its commentary, we therefore hold that U.S.S.G. § 3B1.3 applies to inchoate

crimes if the district court determines "with reasonable certainty" that a defendant "specifically intended" to use a special skill or position of trust in a manner that would have significantly facilitated the commission or concealment of the object of the conspiracy. *Cf. Turner,* 272 F.3d at 390 ("The district court did not commit clear error in making the factual determination that [the defendant] intended to use his skills as a police officer to commit the robbery.").

■ Employing this analysis, we conclude that the district court correctly applied § 3B1.3 to the defendants in this case. The jury found that Ward and Drucker agreed to issue false audit reports to facilitate and conceal the stock-manipulation scheme. Without these reports, potential investors—the intended victims of that scheme—would likely have become suspicious and refrained from purchasing stock in the post-merger entity. The other conspirators recruited Ward and Drucker specifically for the purpose of using their accounting skills to make it appear as though the audit reports for GTrade and SearchHispanic were issued independently. Ward and Drucker therefore plainly intended to use their accounting skills "in a manner that [would have] significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The district court correctly applied § 3B1.3 to both defendants.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court in all respects except for its determination that the three-level inchoate offense reduction prescribed by U.S.S.G. § 2X1.1(b)(2) should not apply. We therefore reverse and remand in part with directions that the dis-

trict court resentence the defendants with the benefit of that adjustment.